**Adoption of V. M. C., a minor.**

**Appeal of G. M. and E. M., Petitioners for Adoption.**

**No. 2107.**

Supreme Court of Alaska.

Nov. 29, 1974.

Thomas E. Curran, Jr., Lyle R. Carlson, Fairbanks, for appellants.

H. Bixler Whiting, Fairbanks, for appellees.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

## OPINION

ERWIN, Justice.

This case involves an appeal from a decision of the superior court denying a petition for adoption. Since, among other grounds, the appellant asserts error in the court's failure to find abandonment by the natural father, the facts of the case will be set forth extensively in order to evaluate such a claim.

On November 19, 1967, V. M. C. was born to appellee, R. C., and his wife in Tacoma, Washington. Twelve hours after the birth the wife died. Appellee, devastated by his loss, agreed to turn over custody of the baby to his mother, the appellant E. M., who had come down from her Fairbanks home upon news of the tragedy. The understanding at the time apparently was that the appellants were to have custo-

dy of the child in Fairbanks only temporarily, until appellee got settled, and that they would be moving down to the Tacoma area within six months to be with their son and new grandchild. This arrangement was denied by E. M. but was substantiated by the testimony of two of her children who were present in Tacoma at the time.

After appellants had had the child for approximately four months, appellee came up to Fairbanks to be with them. After spending several months with appellants, appellee attempted to return to Tacoma with his son in June, 1968. He was, however, unsuccessful in this effort when it became apparent that appellants did not intend to relinquish custody of the child to him. It was the feeling of the appellants, apparently, that as he had not yet obtained permanent employment appellee was not at. that time in a position to properly care for the child (to whom appellants were by then quite attached).

There is evidence to the effect that the appellants had in fact contacted an attorney in Fairbanks in May, 1968, about the possibility of initiating adoption proceedings in order to retain custody of the child, at least until such time as he could, in their opinion, be properly cared for by his father. The appellants apparently knew at that time, however, that appellee would not consent to adoption. They therefore proceeded on June 5, 1968, to file in the superior court in Fairbanks for the adoption of V. M. C., contending that under AS 20.10.-040(6) the appellee's consent was not necessary as he was unfit to have the care and custody of the child (in their supporting affidavits appellants specifically alleged that appellee was too "irresponsible" and "immature" to be allowed custody). There was no allegation in the petition that appellee had in any way abandoned his parental responsibilities, and appellants admitted there were no grounds for such an accusation at that time.

The next day, on June 6, 1968, appellants brought appellee in for a conference with the attorney [1] and, after considerable discussion, obtained what may be best described as appellee's "grudging" acquiescence in their continued custody until he had become "established."

There is no evidence that appellee was ever informed at that time of the actual filing of the petition. Appellants' attorney, however, admits that he "might have referred to a restraining order" at the time he advised appellee that the appellants were prepared to bring adoption proceedings if he did not consent to their continued custody. At any rate, appellee returned to Tacoma alone that day under the impression that appellants had a court order preventing him from taking the child with him. In fact, no such order had been entered.

One month later, in July, 1968, appellee came up to Fairbanks again and made a second attempt to take his child home with him. Physically prevented from taking V. M. C. onto the return flight with him by appellant G. M., appellee was told by G. M. that the matter was in the hands of the court, which now had jurisdiction over the child.

From July, 1968, until April, 1972, a period of almost four years, no further direct steps were taken by either appellants or appellee toward resolving the matter. There were apparently no direct communications between the parties during this period, and no further action under the petition was sought by appellants. The appellants retained custody of V. M. C. and raised him as their own child. Appellee meanwhile obtained regular employment in Tacoma and later entered into a relationship with a woman whom he married in April, 1972. Although appellee did little to assert his parental rights during this period, and had in fact made no real attempt to even contact his son beyond sending birthday and Christmas presents to him in Fairbanks, there is nevertheless considerable evidence to the effect that he still wanted his child. Described by his sister

1. The attorney consulted did not act as counsel in the case at bar.

as a rather retiring and timid person, appellee was in continuous contact with his brothers and sisters about his predicament but did not feel that there was much he could do to actively remedy the situation in view of appellants' unyielding resistance. In fact, the whole family became embroiled in the "controversy," the brothers and sisters of appellee apparently unanimously siding with him against the appellant, their mother. The fact remains, however, that throughout this four-year period appellee took no direct action whatsoever to regain custody of this child. Moreover, appellee provided no financial assistance or support for the child; in 1968 he made at least one initial offer to do so, but this was refused by appellants who informed him that it was not necessary since he was not then working. There is no evidence that he ever sent any financial assistance once he had a steady income.

Matters finally came to a head in April, 1972, when appellants learned that appellee had developed cancer and was refusing to take treatments unless his son was returned to him. Appellants refused to respond to this and instead filed an amended petition for adoption on April 11, 1972 (appellant G. M. testified that their action was prompted by appellee's refusal to accept treatment, which was to them evidence of his "mental instability"). In addition to the allegation in the original petition that appellee was unfit, appellants now also alleged that he had willfully·abandoned his child, and that his consent to the adoption was therefore not necessary under AS 20.-10.040(4). A hearing on the matter was ordered for May 18, 1972.

Upon learning of this development (there is some question as to whether appellee was properly served with notice of the hearing), appellee decided to get his son back and to that end enlisted the aid of his sister, who was living with appellants at the time, and a brother. On April 18, 1972, these two surreptitiously took V. M. C. from appellants' home and flew with him back to Tacoma. It is uncontroverted that this was all done at the urging of appellee, who paid for the plane tickets.

The next day, on April 19, appellants obtained from the superior court an ex parte order for the return of custody of the child to appellants and restraining appellee from interfering therewith. Appellants then took the order to Washington and sought to have it entered there in order to regain custody of the child. Although the order was initially honored by the Washington trial court, appellee sought to have the proceedings stayed and on April 26, 1972, the Court of Appeals of the State of Washington entered an order granting a writ of prohibition and remanded the case to ·the trial court with instructions that the ex parte Alaska order granting custody to the appellants did not establish a superior right of custody in them as against the rights of the child's natural father.

Appellants then returned to Alaska without the child and pursued their adoption proceedings. On May 18, 1972, the hearing on the petition was held, counsel for appellee specially appearing to challenge the court's jurisdiction and to request a continuance of the matter until the litigation in Washington was completed. An order was entered perpetuating the appellants' uncontroverted testimony at the hearing and continuing entry of the decree of adoption until June 22, 1972. It was ordered that appellee had until that time to personally appear and contest the matter and that failing such appearance the decree of adoption would be entered upon that date (although there is some indication that service of this order may. not have been properly effected, the record reflects that personal service was in fact made on May 30, 1972).

The June 22 hearing was held and, appellee having failed to enter an appearance, the appellants' amended petition was granted and a decree of adoption was entered.

On July 21, 1972, appellant G. M., accompanied by a friend, went to Tacoma to get the child. After an unpleasant con-

frontation in the yard involving some rather violent pushing and shoving, they managed to wrest control of V. M. C. from appellee's sister (with whom the child had been spending the afternoon) and returned with him to Fairbanks.

The prosecuting attorney's office in Tacoma then entered the fray and threatened G. M. with criminal prosecution for kidnapping unless V. M. C. was immediately returned to the custody of his father.

In December, with matters then truly in an uproar, steps were taken to reopen the adoption proceedings to allow the entire matter to be fully litigated on the merits and to thereby avoid the continuing jurisdictional and procedural conflicts and the possible criminal action against the appellant G. M. On January 2, 1973, an order setting aside the decree of adoption was entered by the superior court and a full hearing on the amended petition was scheduled. In March, 1973, appellee filed a petition for review with this Court for the purpose of testing the jurisdiction of the superior court. The petition, however, was denied, and the matter proceeded to hearing on May 29, 1973, at which both appellants and appellee appeared and presented evidence.

At the conclusion of the hearing the superior court found that there was no evidence adduced to support a finding that appellee was an unfit parent. It likewise found that there was insufficient proof of abandonment to allow the adoption to proceed without appellee's consent. As a result the court denied appellants' amended petition, ordered that the care, custody and control of V. M. C. be returned and granted to the appellee, and retained jurisdiction over the matter pending a report on the family situation and adjustment of V. M. C. by the Divison of Family and Children Services. The court also ordered that ap-

pellee recover costs and reasonable attorneys' fees from appellants, and judgment in the amount of $4,462.28 for such costs and fees was subsequently entered against them.

The major challenge here specifically raised on appeal by appellants is that

> [t]he trial judge erred in refusing to accept the objective evidence of abandonment and instead denied the adoption because of evidence that subjectively suggested that the natural father did not manifest an intent to abandon the child . . . . [and that] the trial Court . . . was excessively influenced by the subjective intent of the natural parent . . . .[2]

AS 20.10.040(4) provides in part that the consent for adoption of a minor is not required

> from a parent whose wilful abandonment for a period of not less than 30 days preceding the filing of the petition is established in the adoption proceeding
>
> . . . .

In a recent decision this Court clearly enunciated the evidentiary standard to be applied in questions of abandonment under this statute.[3] In In re D. M. v. State, 515 P.2d 1234 (Alaska 1973), it was concluded that, as distinguished from evidence of the subjective intent of the relinquishing parent, an objective standard of abandonment is necessary and that

> [a] better definition of abandonment, for these purposes, is that abandonment consists of conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship.[4]

In In the Matter of the Adoption of A. J. N., 525 P.2d 520 (Alaska 1974), we expanded upon this language, observing that

---

2. Brief for appellants at 11, 13.

3. Although the case dealt specifically with the test for abandonment under AS 47.10.080 (c)(3)(B), and, by reference, AS 20.10.040 (3), and considered a finding of abandonment and a termination of parental rights in an

action prior to any adoption proceeding, the criterion should clearly be the same where the question is first raised in the adoption proceeding itself.

4. 515 P.2d at 1237.

though the best interests of the child are a valid consideration in deciding the question of abandonment, they cannot be the sole determinant since

> [t]he test focuses on two questions—has the parent's conduct evidenced a disregard for his parental obligations, and has that disregard led to the destruction of the parent-child relationship? The best interests of the child are relevant to the latter question . . . . [b]ut the child's best interests may not always be directly relevant to the question of the parent's disregard of his obligations. This part of the test can only be satisfied by proof that the parent's conduct evidences a conscious disregard of his obligations.[5]

These cases demonstrate that in deciding the question of abandonment the trial court must initially predicate its determination upon objective evidence of parental conduct indicating a conscious disregard of the parental role. Clearly, under the mandate of In re D. M., a conclusion of non-abandonment based solely upon evidence of the parent's subjective intent not to abandon his responsibilities would be reversible error. Further, absent a sufficient finding of the requisite conduct, even a consideration of the best interests of the child and a breakdown of the parent-child relationship would be insufficient to support a finding of legal abandonment.

In the instant case the trial court entered its final decision before this Court handed down its opinion in In re D. M. Appellants argue that, inconsistent with the rule adopted in In re D. M., the trial court denied the adoption because of evidence of appellee's subjective intent not to abandon the child, and that it further "refused to accept" the objective evidence of abandonment. To demonstrate that the court was "excessively influenced" by the subjective

intent of appellee, appellants cite selected language of the court which indicates recognition of evidence that appellee subjectively wanted his child during the period in question.

A perusal of the entire memorandum decision of the trial court, however, reveals that the court also specifically concluded that

> [a]lthough [appellee] may not have as vigorously and strenuously enforced his parental rights as another person similarly situated may have, it certainly, by any stretch of the imagination, cannot be said he abandoned his child.[6]

The court then went on to make the following specific findings, supported on the record, which relate to the actual conduct of appellee with respect to the pursuit of his parental role: that he had offered to pay support for the child, which offer was refused by appellants; that he had departed Alaska without his child in early 1968 only after being threatened by restraining and adoption proceedings; that he attempted a second time to obtain his child but was prevented from doing so by the physical interference of one of the appellants; that he refused to take medical treatment in a dramatic but unsuccessful effort to pressure appellants into surrendering the child; that he subsequently persuaded his brother to come to Alaska and, with his sister, take the child and return him to Tacoma; that he paid for the plane fares in this effort; that testimony relating to appellee's failure to correspond with appellants about the matter after 1968 was controverted by later testimony at trial to the effect that he had made phone calls to Fairbanks concerning his son, and that he had sent birthday presents to him over the course of the years.[7]

These specific findings, considered in conjunction with the language of

5. 525 P.2d at 523.

6. Record at 167–68.

7. Record at 168–69.

the court noted *supra,* compel the conclusion that the court considered evidence of appellee's subjective intent only in contextual and interpretive reference to his actual situation and conduct.[8]  Even though the trial court did not specifically indicate that its decision was based upon evidence of objective conduct rather than subjective intent, our reading of the court's opinion leads us further to conclude that it found the actual behavior of the appellee under the circumstances to be entirely consistent with the inference that he had not consciously abandoned his parental role.[9]  We discern no error in these findings, nor are we persuaded that the court's decision was founded upon other than the .proper evidentiary criteria.  Furthermore, we find no merit in the contention that the court was "excessively influenced" by appellee's subjective intent and refused to accept the objective evidence in the case.

■ During the full hearing on the amended petition for adoption, appellants sought to have a psychiatrist, qualified in the area of child psychiatry, give his professional opinion that it would not be in the best interests of the child to be taken from the appellants and returned to Tacoma to live with his natural father.  Appellee objected that the doctor's opinion was based only upon a limited investigation into the conditions of the child's life with appellants and was formulated without knowledge of appellee's life style or home situation for comparison.  The court ruled

that the opinion was without proper foundation and denied its admission.

Appellants contend that this ruling was incorrect and argue that Alaska law supports the admissibility of qualified expert opinion testimony when such opinions could be helpful in deciding the issue in question.[10]  Conceding that appellants' understanding of Alaska law is correct, their argument is nevertheless without dispositive effect in this review.

It may be seen that the proferred testimony of the psychiatrist related *only* to the question of the welfare and best interests of the child.  In light of the foregoing discussion of the proper tests for determining abandonment, we need not reach the question of its admissibility; its exclusion constitutes harmless error at worst.

As we have noted, a finding of abandonment under AS 20.10.040(4) involves a two-pronged inquiry: there must first be a finding of conduct evidencing a conscious disregard of parental obligations; secondly, the court must find that such disregard has led to the destruction of the parent-child relationship.  Evidence of the best interests of the child relates to the latter inquiry, but may not be relevant to the former.  In fact, we have stated that "[t]his part of the test can *only* be satisfied by proof that the parent's conduct evidences a conscious disregard of his obligations." [11]

The two elements of the test are interdependent; both must be established if there

---

8. It was specifically recognized in In re D.M. that the trial court could take into account the verbal expressions of the parent as well as his actual conduct.  515 P.2d at 1236.

9. It is significant that the picture the trial court paints in its findings is in many ways similar to that found in this Court's discussion in *A.J.N.*  There, in considering the evidence of abandonment from a non-custodial father's failure to exercise his visitation rights or to maintain contact with his child over the years, we concluded that
  R.N.'s conduct with respect to his daughter does not evidence a disregard of his parental

obligations.  He has consistently sought to enjoy his visitation rights only to be frustrated by the obstructions placed in his way by R.T. . . .  His inability to establish a close relationship with his daughter is not of his doing or choice, but in spite of his wishes.
525 P.2d at 523.

10. Appellants' brief at 15, *citing* Ferrell v. Baxter, 484 P.2d 250 (Alaska 1971), and Harding v. Harding, 377 P.2d 378 (Alaska 1962).

11. 525 P.2d at 523 (emphasis added).

is to be legal abandonment. The mere fact that there is evidence of the relationship's destruction is of no consequence if it cannot be established that there was parental conduct which caused it. Therefore, evidence relating *solely* to the question of what disposition may be in the child's best interests—evidence pertinent primarily to an inquiry into the present vitality, strength and stability of the parent-child relationship—is ultimately inconsequential in the absence of proof of the requisite prior conduct. Since the superior court properly concluded that the appellee's conduct did not evidence a conscious abandonment of his parental obligations, appellants suffered no prejudice from the court's rejection of the proferred testimony.

The trial court ordered that the appellee recover costs, disbursements and reasonable attorney fees against appellant. A bill of costs and supporting affidavits were submitted by appellee and his counsel indicating costs amounting to $2,462.88 and actual attorney's fees totalling over $3,250.00. Judgment was subsequently entered against appellants in the amount of $2,462.28 for costs and $2,000.00 for attorney's fees, a total award of $4,462.28.

Appellants contend that costs and attorney's fees should not be awarded in adoption cases as a matter of judicial policy. They argue that AS 09.60.010 and Rule 82(a) of the Alaska Rules of Civil Procedure should not warrant such awards, that inequity would result, and that to establish such precedent would be "unjust and against public policy" in creating a chilling effect upon the legitimate assertion of rights by both parties in contested adoption proceedings.

It has been consistently recognized by this Court that the fundamental purpose of Civil Rule 82 in providing for the award of attorney's fees is

. . . to partially compensate a prevailing party for the costs to which he has been put in the litigation . . . . The rule was not designed to be used capriciously or arbitrarily, or as a vehicle for accomplishing any purpose other than providing compensation where it is justified.[12]

We have further held that the award of costs and fees to the prevailing party is clearly within the broad discretion of the trial court.[13] Like the award itself, the actual determination of who the "prevailing" party is is also within that discretion.[14]

Only upon a clear abuse of discretion can this Court interfere with its exercise, such abuse being established only where it appears that the court's determination is manifestly unreasonable.[15]

Upon consideration of the record the amount of the award of costs and fees in the instant case does not appear un-

12. Preferred General Agency of Alaska, Inc. v. Raffetto, 391 P.2d 951, 954 (Alaska 1964); *accord*, Malvo v. J. C. Penney Co., Inc., 512 P.2d 575, 587 (Alaska 1973); *see* State v. Abbott, 498 P.2d 712, 731 (Alaska 1972).

13. Froelicher v. Hadley, 442 P.2d 51 (Alaska 1968); Dale v. Greater Anchorage Area Borough, 439 P.2d 790 (Alaska 1968).

14. DeWitt v. Liberty Leasing Co. of Alaska, 499 P.2d 599 (Alaska 1972); Owen Jones & Sons, Inc. v. C. R. Lewis Co., 497 P.2d 312 (Alaska 1972). As a general rule, however, the "prevailing party" is considered to be the party who has successfully prosecuted or defended against the action, the one who is successful on the "main issue" of the action and "in whose favor the decision or verdict is rendered and the judgment entered." Buza v. Columbia Lumber Co., 395 P.2d 511, 514 (Alaska 1964). *See* Cooper v. Carlson, 511 P.2d 1305, 1308 (Alaska 1973). *See also* DeWitt v. Liberty Leasing Co. of Alaska, and Owen Jones & Sons, Inc. v. C. R. Lewis Co., *supra*.

15. Cooper v. Carlson, 511 P.2d 1305 (Alaska 1973); Palfy v. Rice, 473 P.2d 606 (Alaska 1970); Froelicher v. Hadley, 442 P.2d 51 (Alaska 1968).

reasonable and does not evidence an abuse of the trial court's discretion. The total award of $4,462.28 is clearly compensatory in nature and is neither capricious nor arbitrary in light of the amount of costs and fees substantiated by affidavits in the record.[16] As to appellants' request that we disregard the mandate of Rule 82 as a matter of policy, we do not find in the facts of this case or the equities of appellants' position any sufficiently demonstrable interest or justification to warrant such a departure from established precedent.[17]

The decision of the trial court is affirmed.

16. Such affidavits indicate that substantially more costs and attorney's fees were actually paid by appellee by the time the final hearing in Fairbanks was had. This was due in large part to the fact that appellee and his witnesses were residents of Tacoma, Washington, and substantial transportation costs were thereby necessitated.

17. It is to be noted, however, that a revision of the general policy of Rule 82 is now being considered by this Court. We do not mean by our specific ruling here to foreclose the possibility of future changes along the lines suggested by appellants.