RICHARD M. PYATT *et al.*, Petitioners-Appellants, *v.* WILLIAM EUGENE PYATT *et al.*, Respondents-Appellees.

Fifth District    No. 79-553

Opinion filed August 21, 1980.

R. N. Gandy, of DuQuoin (Peek & Gandy, of counsel), for appellants.

David W. Watt and Mark A. Hamrock, both of Hendricks, Watt & Grace, Ltd., of Murphysboro, for appellees.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

This appeal follows an order of the trial court denying a petition for termination of the parental rights of respondent, Gustav Alexander, who is the natural father of two minor children, William Eugene Pyatt, formerly Leo William Alexander, and Jonathan Simonds Pyatt, formerly Jonathan Simonds Alexander. In order to adopt these children absent respondent's consent, petitioners, Gayl Pyatt, formerly Gayl Alexander, and Richard Pyatt, the natural mother and stepfather of the children, sought termination of his parental rights on four grounds of unfitness. After a hearing on August 8, 1979, the trial court found that respondent's conduct did not constitute unfitness under any of the four grounds and denied the petition. The sole issue on appeal is whether this determination was against the manifest weight of the evidence.

In accordance with section 1 of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501), petitioners alleged that respondent was unfit by reason of any one of the following grounds: (1) abandonment of the children, (2) desertion of the children for more than three months next preceding the commencement of the adoption proceeding, (3) failure to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare and (4) other neglect of or misconduct toward the children.

The natural parents of the children were married in 1965. The first child, Will, was born September 9, 1970. The second, Jon, was born October 17, 1972. About six weeks after the birth of the second child, their father left the marital home in or near Dayton, Ohio, and on April 18, 1973, an Ohio court granted their mother a divorce and custody. The father was granted visitation privileges and required to provide child support in the amount of $25 per week for each child. The court also granted the mother permission to remove the children from the State of Ohio. With them she moved to Carbondale, Illinois, near her family who helped her financially. While there she attended law school from 1973 to 1976 and, in 1976, married Richard Pyatt, a funeral director in Pinckneyville, where the Pyatts, together with the children, since have lived. At the time of the hearing Mrs. Pyatt had been practicing law for approximately three years.

Apparently Mr. Alexander met his obligation of child support fully

until sometime in 1974. Mrs. Pyatt testified that in October of that year she initiated proceedings in Ohio because of arrearage in the amount of $800. She took similar legal action twice in 1975 because of arrearage amounting to "roughly $1500" in approximately April and $1850 in December of that year. Mrs. Pyatt confirmed the correctness of Mr. Alexander's statement that he stopped making child-support payments altogether in 1975. In the summer of 1977 arrearage amounted to about $5000, and, according to petitioners in their brief, at the time of the hearing on the petition in 1979, it stood in excess of $10,000. Mr. Pyatt testified that he and Mrs. Pyatt had been supporting the children since they came into his home.

The testimony indicated that during the time Mr. Alexander paid child support, that is, during the years 1973, 1974 and 1975, he exercised his weekend visitation privileges. How regularly he did so is not addressed in the record. In response to the question, "Back in 1975 and beyond when he did visit with the boys how long would his visits last?" Mrs. Pyatt answered, "Well, he would come on a weekend and arrive at our home in the morning and be with the children that day and then return on Sunday morning and spend maybe 2/3rds of the day." At that time Mr. Alexander was teaching in Dayton. Mrs. Pyatt testified that when she lived in Dayton it was a six-hour drive one way from Dayton to Carbondale. Mr. Alexander testified that "generally on Saturday night I would stay with them until about 7:00 or 7:30 or 8:00, until night time or dark. Then I would pick them up again the following Sunday morning and stay with them until maybe later on in the afternoon."

We notice that the terms of the divorce decree, which is attached to the petition as an exhibit, provide for visitation approximately every third weekend. The terms appear not to have permitted Mr. Alexander to keep either child overnight or away from the mother's home at night during weekend visits until the younger child had attained the age of two years, an event which occurred in October 1974, when the older child was four years old. The decree provides as well for visitation during the summer for a certain period of time and during the "Christmas season" from December 27 until January 1. The overnight restrictions apply similarly to these kinds of visitations with the difference that the children were to be returned in the evening to go to bed until the younger child had attained the age of four, provided the father had not remarried. Since Mr. Alexander did not remarry, overnight visitation would not have been possible during "Christmas season" visitations until 1976, when the older child was six years old, or during summer visitations until 1977, when the older child was seven years old. The decree also provides that the father be allowed to talk with the children on the telephone but "not" * * * more than once per week unless absolutely necessary."

In 1975 Mr. Alexander moved to Virginia Beach, Virginia, where he

was teaching. He visited the children in Carbondale, he said, "sometime during that fall quarter" during a five-day weekend. He stated that it was a 22-hour drive one way. Between the time of that visit in 1975 and the hearing in 1979 Mr. Alexander had not seen the two children. Mrs. Pyatt testified that at no time during the period between the visit in 1975 and January 1979, had Mr. Alexander asked to visit them; Mr. Alexander testified that he was "not sure" whether at any time during this same period he had asked to visit.

Mrs. Pyatt testified that at Christmas time in 1975 Mr. Alexander neither sent a gift to the children nor visited them. She said that the reason he had given for not visiting them in December 1975, was "because he was involved in a dramatic production or a play, I believe." She stated that in 1976 the boys received from him neither birthday nor Christmas gifts. During 1976 Mr. Alexander called once, a call to Will on Thanksgiving. In 1977, on September 16, Will received from his father for his birthday, which had occurred a week earlier on September 9, a birthday card and two T-shirts that were too small either for Will or for his younger brother. In December 1977, a gift arrived in time for Christmas for Will but not for Jon. In January 1978, Mr. Alexander called to inquire about whether the gifts had arrived and, learning that one had not, sent a second gift to Jon, which arrived about a week later. In 1977 the children received no telephone calls from their father. In 1978 he called a second time during that year on Thanksgiving morning. That year apparently he sent no Christmas gifts; he testified that he had planned to see the children after Christmas of that year. Apparently early in January 1979, he called to arrange a visit with the children.

Mrs. Pyatt testified that during the three-year period the children received no letters from their father. Although she indicated that he had "not ever" asked for a picture of the boys, it is unclear from the record whether she meant during the entire period of time since the divorce in 1973 or during the years between 1973 and 1975 when he was visiting the children. About two-thirds of Mr. Alexander's numerous places of residence since the divorce—approximately 14—were not known to her. She said that since the divorce he had not visited the boys at Christmas time or on their birthdays. Since the divorce the children's paternal grandparents have neither visited them nor inquired of Mrs. Pyatt as to anything about them. Mr. Alexander's father is a neurologist and psychologist in Newton, Massachusetts.

Asked for her opinion as to whether the boys would recognize their father if they were to see him "in a public place such as on the street," Mrs. Pyatt responded,

> "[M]y opinion would be that it would be very unlikely that John [*sic*] would recognize him because it has been such a long time since

John [*sic*] has seen him and he was so young when that last time was. I think there would be a more [*sic*] possibility of Will recognizing him, but it would not surprise me if he did not."

Asked if she knew of "[a]nything that you can think of that would evidence his concern" for the children "in the past three, now 3½ years," she answered, "I know of nothing." Asked, "Do the boys ever ask about Mr. Alexander?" she said "No." She explained why she wanted the adoption by Mr. Pyatt:

"I want Will and John [*sic*] to have a real father. Their legal father pays no attention to them. And might as well not exist, except so far as paper is concerned. They have a step-father [*sic*] who has been a real father to them and I want that real father to be a legal father to them. And that is what they want? [*Sic.*]"

Mr. Alexander's testimony corresponded to Mrs. Pyatt's with regard to the number of visits made and to the number of gifts sent to the children during this period. He disagreed with her to some extent with regard to the number of telephone calls made. He testified, "A lot of times I called and talked to the children, but I did not talk to either Gayl or to her husband." He explained that Mr. and Mrs. Pyatt were at home at the time, and "the kids asked me if I wanted to speak to them and and [*sic*] I said, no. I didn't have any reason to speak to them. I called to speak to the boys." Later, he explained further,

"There were a couple of occasions when the kids asked if I wanted to speak to them [Mr. and Mrs. Pyatt]. There were sometimes [*sic*] when the kids picked up the telephone so they may not have even known that I did call. I can't remember exactly how many calls were involved."

As to the number of letters he wrote, he stated, "I may have written them one or two, but I don't think I have written them very many. I think I may have written them one." Later, confronted by the statement of petitioners' attorney that in calling the children on the telephone, the witness was doing no more for his children than he would do for his friends, Mr. Alexander said, "I don't like to write. What else would you want me to do?" His testimony demonstrated a slender knowledge of the children's personal characteristics, interests, achievements and problems.

Of the arrearage in child support, Mr. Alexander testified, "I certainly plan to make it up." Of a life insurance policy required by the divorce decree to be kept in full force and effect for the benefit of the children, he explained that the policy referred to therein was available through Wright State University and that the policy had expired upon the termination of his employment with that institution in 1975. His explanation and the exchange it sparked follow.

"A [Mr. Alexander] It was the kind of thing where the university

had the policy for you as long as you were an employee there, but when you terminate [*sic*] your employment the insurance just kind of went zero.

Q [Attorney for petitioners] It don't [*sic*] say that in the judgment, does it? It says you are to maintain that insurance, doesn't it?

A That's right. Well, I didn't have insurance.

Q And you didn't maintain it then.

A No, sir.

Q Have you made any provisions, any provisions, for these children? Any way?

A You mean financially?

Q Yeah.

A They are millionaires already. What's the deal?

Q That's not what I asked you.

A I never made any provision. I never made any provision for myself either.

Q I don't see how they are millionaires, any way, any more than you are.

A They were born wealthy.

Q You were born wealthy.

A No, I wasn't.

Q Oh. Your father was a wealthy man.

A No, he is not.

Q All right. We will get into that.

A Let's go into it.

Q Later. Now, you think that because you feel they are weathly [*sic*] there is no need for you to do anything is there?

A No, I don't feel that way. I should send them money because I was ordered to by the Court."

Mr. Alexander testified that he had not visited the children during 1976 and the first half of 1977 because of financial difficulties and that he had not visited them during the second half of 1977 and during 1978 because of not only financial difficulties but also five episodes of mental illness. He said that at the time of the divorce he was teaching at Wright State University in Dayton where he continued to teach until 1975, at which time his annual salary was $13,200. He has a bachelor's degree from Harvard University, a master's degree from San Francisco State University and a doctoral degree in the field of communications from Michigan State University. He explained that he had "chose[n] not to go up for tenure" at Wright State University, that he felt he "didn't really wish to remain settled in that particular line of work for the rest of my life. I felt that I was a young man and possibly I could be successful in another line of work." Because of his choice with regard to tenure, he was obliged to leave the employ of the

university. In anticipation of the termination of his employment there, he attempted in the fall of 1974 "to generate money to get into business for myself" and undertook a small business venture, the marketing of "decorated terrariums." Upon the termination of his employment with the university in 1975 he withdrew $5,000, which had been deducted from his salary and placed in the retirement system of the State of Ohio. Despite his agreement to pay the arrearage in child support from part of that money, he used the entire sum to purchase glassware for his business. Apparently in 1974 and 1975, in an effort to promote his business, he traveled extensively, as he said, "through the eastern part of the United States." Ultimately his business failed: "I am not sure it if [sic] was just lack of capital ·or my product just wasn't sufficiently marketable, but I wasn't able to succeed in it."

Apparently at a particularly difficult time in his business financially, Mr. Alexander obtained a teaching position at Tidewater Community College in Virginia Beach, Virginia. He taught there from September 1975 until December 1976, when the position was no longer funded by virtue of a legislative decision the month before. In the month in which he ceased teaching at Tidewater Community College, he began working for a friend who owned Wilforest Installations, a company which installed fixed seating in theaters and auditoriums, for example. During January and February of 1977 Mr. Alexander continued to work for his friend, Rex Wilforest. The work was sporadic; he lived with a friend but earned a total of only $600 during those two months. From February or March 1977, until the end of June 1977, he worked "through Manpower," in Washington, D.C., earning $125 per week.

Early in July he suffered the first of five "breakdowns." On the third or fourth day of July 1977, he admitted himself voluntarily to Saint Elizabeth's Hospital in Washington, D.C., where he was treated for about five weeks, until approximately August 10, 1977, by Dr. Farrow, a psychiatrist. The drug Lithium was prescribed. By "breakdowns," he explained that he meant he "became psychotic or schizophrenic. I would be out of my head. I would hear voices or be talking to voices [sic] that type of thing. I would be. I don't know. I guess that is how I would describe it." Apparently during this hospitalization, bankruptcy proceedings were initiated, for which the cost of representation was, he said, "taken care of through social services in Washington, D.C."

In the middle of September 1977, he began teaching at Montgomery College. Two months later in November 1977, he suffered a second episode of the same illness and admitted himself again voluntarily to St. Elizabeth's Hospital. Treated by Dr. Farrow and this time by another physician, Dr. Froy, he remained in the hospital until his discharge either shortly after Christmas in 1977 or early in January 1978. The medications

Lithium and Stelazine were prescribed. After this illness he was "not allowed" to return to his employment at Montgomery College. In January 1978, he worked for "a sales outfit in Washington" but was "unsuccessful at it." In February 1978, he installed fixed seating again.

He had accepted a job at the Campanedia Foundation at Summerville, Georgia, when he suffered a third episode of the illness for about eight days in May 1978. Lithium and Stelazine were again prescribed. After his release he earned $400 a month working for the Foundation, which he described as "sort of a treatment facility for behavior disordered teenage males and primarily from the Atlanta area." He was there until about the middle of September 1978, when he left to begin a post-doctoral teaching fellowship at Kent State University in Ohio in the division of weather communications in the school of speech. His stipend from the fellowship, which extended from September 15, 1978, until August 25, 1979, was $550 per month. He explained that he was willing to work for such comparatively low wages in order, by means of post-doctoral study, to reestablish himself in academia. He indicated that while attempting to reenter the teaching profession, he had gone to "a couple other colleges and universities for jobs, but * * * didn't get the appointment."

While he was at Kent State University he had two further episodes of illness, one in the fall of 1978, when he "swallowed a whole handful of stelazine and pulled out of it," and the other, the final of the five episodes, in the spring of 1979. During the fourth episode he was not hospitalized, but during the final episode he was admitted to the Health Center at Kent State University and was treated by Jay Cransen, Director of the Health Center, and Dr. Semour Barrow, a clinical psychologist and a former department chairman of the Department of Psychology. Mr. Alexander testified as follows with regard to the duration of his stay at the Health Center:

> "Well, I got well after about 7 weeks or so, but I actually stayed on a little bit longer until the end of the quarter. It was very inexpensive. Good food. So, I stayed there until the end of the quarter."

He testified that at the time of the hearing he was on a maintenance dose of four milligrams of Stelazine daily and had had no further problems since the episode in the spring of 1979.

During the hearing petitioners objected to a lack of medical records to corroborate Mr. Alexander's testimony with respect to his illnesses. Mr. Alexander testified that he had not known until the day before the hearing that he was going to be questioned at all and that he had not been asked to bring his hospital records. He offered to provide his medical records and said that he had "the names of people you can contact." He had not told Mrs. Pyatt about his illness. He said he had told his family and some of his close friends about it, adding, "Normally, I would not discuss that type of thing with anyone else." He indicated that the amount of time he spent in

the hospital during the episodes did not represent the entire duration of his illness:

"It takes a while even after you first get out of the hospital you are still not fully right for a while. It takes a while before you really healed [*sic*] again. I mean you are lucid, and in the hospital you just walk around in a ward all day. What I mean, you are well enough to leave the hospital, but you are not fully restored."

In response to the question, "Why didn't you try to better yourself?" Mr. Alexander answered that he had tried to do so and explained how:

"A Well, in the summer after I got ill the first time, July 4, 1977. Okay. After I got out, even while I was still in the hospital I applied for jobs through the speech communications association placement center. It's on a national basis.

Q [Attorney for petitioners] Yes.

A And I continued to do that during the summer. I also worked [*sic*] for work in part time teaching at different colleges in Washington, D.C., Maryland area, and I was fortunate to get a part time teaching position at Montgomery College.

Q Did you ever apply at some of the tire plants at Dayton, Ohio, for jobs?

A Well, I never lived in Dayton, Ohio, at that time. [When the witness lived in Dayton, he taught at Wright State University.]

Q All right. Sorry. Did you ever apply at any large plants for employment?

A Yes.

Q Where?

A Communication Satellite Corporation.

Q Were [*sic*] was that at?

A Washington, D.C.

Q Anywhere else?

A Primarily I worked trying to get back into teaching, if I could.

Q I know that. But, you're telling the court today the reason you didn't visit with your children was partly because you did not have enough finances.

A That is correct.

Q But, what I am asking you, is why didn't you try to secure employment, a man with a PhD, where you would make more money. That's why I am asking these questions.

A I did. I also tried through the Federal Job Service in Washington, D.C., Civil Service and so forth.

Q Did you ever answer any adds [*sic*] in the paper?

A Yes.

Q What?

    A I got my job at Campenadia [*sic*] through a newspaper."
Earlier, in response to a question, he testified that he had gone to the unemployment agency in Akron, Ohio, in his search for work.

    Mr. Alexander testified that the day before the hearing he had accepted a new position teaching at the University of Miami. He was to begin his work there the following week. When asked if there was "any reason" why he hadn't seen the children for over three years, he answered,

> "Well, I had a lot of problems of my own. I was not able financially to travel that far to visit with them. I had a lot of illness as well. But, I love them very much. I certainly would like to—. I am in a situation now where I have a regular teaching position again. I have an income. I have approximately the same income that I had at Wright State University. I am in a situation where I could resume to make child support payments and make regular visitation."

    Although the record is not altogether clear with regard to the number and dates of calls Mr. Alexander made in his effort to see the children in January of 1979, he called first, according to Mr. Pyatt, on a Sunday evening, January 7, 1979, and spoke with Mrs. Pyatt about visiting the children. According to Mr. Alexander, Mrs. Pyatt thwarted his effort to see them, telling him he could not come at the time he requested because of her "plans" for that weekend. Mr. Pyatt testified that Mr. Alexander called again the following Sunday evening, on January 14, 1979, and spoke with him about visiting the children. Mr. Pyatt advised him that Mrs. Pyatt's father might require surgery in Rochester, Minnesota, and that if so, the Pyatts would be with him. Mr. Pyatt said he would call Mr. Alexander in the middle of the week. He did so, explaining to him that because of the surgery the proposed visitation would not be possible. About one week later, approximately January 22 or 23, according to Mr. Pyatt, Mr. Alexander called again and spoke with Mrs. Pyatt, who told him that her father was going back into the hospital that coming weekend. On Friday of that week, January 26, 1979, Mr. Pyatt called Mr. Alexander to arrange a meeting with him in Cleveland on the following Monday, January 29. On January 29 Mr. Pyatt flew to Cleveland, taking with him a form for consent to adoption. Mrs. Pyatt had procured the services of an attorney in Cleveland who was to "arrange an appearance before a Judge in Cleveland," provided Mr. Alexander was willing to consent to the adoption Mr. Pyatt would propose. The petition for his unfitness, which is the subject of this appeal, had been filed on Friday, January 26, 1979, in the event that Mr. Alexander's consent was not forthcoming. When Mr. Alexander learned of the proposal at the one-hour meeting on Monday, he refused at once to consider it. Mr. Pyatt testified that Mr. Alexander had responded to it with the words, "I won't talk about it."

    Although neither party discusses in the briefs the change of the child-

ren's names, it was brought out during the hearing that in February of 1977, about nine months after the Pyatts were married and about two years before the adoption proceeding, they had had the names of the children changed in a court proceeding without notice to Mr. Alexander. The name Leo William Alexander was changed to William Eugene Pyatt, and the name Jonathan Simonds Alexander was changed to Jonathan Simonds Pyatt. Mrs. Pyatt testified that she and Mr. Pyatt had discussed the adoption prior to the proceeding for the change of names. When asked, "Is there any particular reason you did not file an adoption Petition at that time as along [*sic*] as you were changing their names?" she gave the following reason:

> "I felt it was important from the standpoint of having a good case and it made good sense that Mr. Pyatt and I live together as a family with the children for more than a few months before we made that determination."

Having stated 20 separate findings of fact in its order, the trial court continued as follows:

> "Based upon the foregoing the evidence presented and the observations of the Court during the hearing, the Court further finds:
>
>> That the evidence that the Respondent did not exercise visitation rights after 1975; pay his child support obligation; and more frequently display parental interest in the children as their non-custodial parent, was to the Court the result of misfortune in business; unemployment; inadequate income from his employment, both as a teacher and as a manual laborer; the necessity for travel in his non-professional job as a manual laborer and relocation for various teaching positions; the difficulty of visitation with the children over the great distances involved in reaching their maternal home; and a series of five mental breakdowns, each of which resulted in his committing himself to hospitals for mental treatment.
>>
>> Therefore, the Court concludes and finds that the conduct or non-action of Respondent did not constitute abandonment or desertion under the law; that the evidence herein reveals exculpatory reasons why Respondent did not take action, during the periods in question, to illustrate his reasonable interest, concern and responsibility as to the welfare of the children; that taken as a whole, the foregoing facts do not show an intent to desert or to abandon the children, nor do they evidence clearly or convincingly such neglect or misconduct, under the circumstances, as to justify this Court in finding the Respondent to be an unfit parent under the evidence."

■■ To justify termination of parental rights, the parent's unfitness for the exercise of parental rights must be established not merely by a preponderance of the evidence but by clear and convincing evidence presented in strict compliance with the Adoption Act. (*In re Grant* (1975), 29 Ill. App. 3d 731, 331 N.E.2d 219.) It is axiomatic that a court of review may not disturb the findings of the trial court unless they are palpably against the manifest weight of the evidence. (*Houston v. Brackett* (1963), 38 Ill. App. 2d 463, 187 N.E.2d 545.) The opportunity of the trial court to observe the conduct and the demeanor of the parties while testifying is, of course, a vital factor in the evaluation of the correctness of the court's determination. (*Houston v. Brackett.*) Nevertheless, we have read the entire record on review, and in our opinion petitioners proved by clear and convincing evidence that Mr. Alexander failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of these two minor children. We think that the trial court's finding that the evidence reveals "exculpatory reasons" sufficient to excuse Mr. Alexander's omissions between 1975 and 1979 is contrary to the manifest weight of the evidence.

"When dealing with cases of this nature, it is not a question of searching for fixed standards or binding precedent. Each case is *sua generis*. [Citation.] It is of little use to compare frequency of visits, cards, or gifts with the frequency in other cases." (*Blakey v. Blakey* (1979), 72 Ill. App. 3d 946, 948, 391 N.E.2d 222, 224.) While Mr. Alexander did suffer financial difficulties and episodes of mental illness, the former were not so great and the latter were not so long as to justify omissions of such long duration. Furthermore, according to Mr. Alexander's testimony, he did not become ill until at least a year and a half had passed, during which he had called one child but once. During that time he had sent no gifts and no letters—or possibly one. His excuse: financial difficulty. Although Mr. Alexander might have preferred to call the children on the telephone rather than to write them letters, if he could not afford to reach them by telephone in his reduced financial circumstances, he could have done so by means of the mail. When the choice is between a word from the parent and none at all, the writing of a letter seems a small parental sacrifice. As any parent who maintains a reasonable degree of interest, concern or responsibility with regard to the welfare of a child knows, doing so entails some degree of parental sacrifice, however gladly made. The absence of any whatsoever is telling.

Therefore we reverse and remand the judgment of the circuit court of Perry County.

Reversed and remanded.

HARRISON and KASSERMAN, JJ., concur.