## 2. Hearing

### A. Validity of "fact-policy" distinction in determining entitlement to hearing.

 It is undisputed that the CFEC did not afford Miner a hearing at all.[13] Although this is normally one of the basic components of due process, it is subject, at least in the area of administrative law, to the exception that one need not hold a hearing if there is nothing to hold a hearing about; or, more precisely, "there is no requirement, constitutional or otherwise, that there be a hearing in the absence of substantial and material issues crucial to [the] determination." *NLRB v. Bata Shoe Co.,* 377 F.2d 821, 826 (4th Cir. 1967); *see also Anti-Defamation League v. FCC,* 403 F.2d 169, 171 (D.C.Cir.1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969); *Sun Oil Co. v. FPC,* 256 F.2d 233 (5th Cir.), *cert. denied,* 358 U.S. 872, 79 S.Ct. 111, 3 L.Ed.2d 103 (1958). On point is our own case of *Silides v. Thomas,* 559 P.2d 80 (Alaska 1977), in which we held that a candidate who failed to comply with filing deadlines was not entitled to a hearing on the matter: "[W]e find this argument unpersuasive since the pertinent statutes do not require a hearing and the record shows that none of the relevant facts are in dispute. Under such circumstances the Lieutenant Governor was not required to conduct an administrative hearing." *Id.* at 89.

Thus, if an application is rejected because it is outside valid time limits and this lateness is apparent on the face of the application and is not contested by the applicant, then there would be no substantial and material issue which could be resolved at a hearing, and thus no need to hold the hearing at all.

 In our view, the foregoing authorities are determinative of this appeal. Here the question comes down to whether the CFEC was required to grant an exception to the filing deadline for applicants who can demonstrate that they failed to timely file because of insanity. In our view, neither due process nor equal protection, under the federal or Alaska constitutions, requires such an exception. In short, the CFEC was under no constitutional or statutory mandate to grant an exception to the filing deadline requirement to one in Miner's position. Thus, it follows that there were no substantial and material issues which required a hearing in regard to Miner's application.[14]

**D. L. J., Appellant,**

v.

**W. D. R., Appellee.**

No. 5411.

Supreme Court of Alaska.

Nov. 6, 1981.

---

Sandra K. Saville, Kay Christie, Fuld, Saville & Coffey, Anchorage, for appellant.

George E. Weiss, George E. Weiss & Associates, Anchorage, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

COMPTON, Justice.

This is an appeal by D.L.J. (stepfather) from a superior court order stating that his petition to adopt his wife's daughter would not be granted without the consent of the natural father, W.D.R. Under AS 20.15.-050(a)(2), the absent parent's consent is not required "if the parent for a period of at least one year has failed significantly without justifiable cause ... (A) to communicate meaningfully with the child, or (B) to provide for the care and support of the child as required by law or judicial decree." There is no question that the natural father failed to send support payments and to communicate with his daughter for two and a half years prior to the adoption proceedings. After a hearing, the probate master found the natural father's consent could not be dispensed with, however, because there was "justifiable cause" for his conduct.

The stepfather filed objections to the Master's Report and asked the superior court to reject the findings or, in the alternative, to grant a hearing "to determine whether ... it is in the best interests of this child to require the natural father's consent to the adoption." After a brief hearing, the superior court affirmed the master's findings.[1] The Master's Report was adopted in full as to its findings, conclusions and recommendations.[2]

The child's mother and natural father were married in Anchorage in 1966 while the natural father was in the military. They moved several times and in 1971 they settled in Colorado, where the child was born on October 26, 1973. When the child was three months old, the couple separated and the mother moved with the child to Anchorage, the mother's family home. The natural father remained in Colorado. During divorce proceedings in August 1974, the couple agreed that the mother would have custody of the child and the natural father would pay $125.00 per month child support.[3]

The natural father visited the child in Anchorage in August 1974, and in September 1975. The mother remarried in December 1976. The natural father's last visit prior to the adoption proceedings was in August 1977, when the child was three years old. At the adoption proceedings, the natural father testified that his child support payments were current through September 1977. After the August 1977 visit, however, he stopped sending child support payments and visiting his daughter until April 1980, when he traveled to Anchorage to oppose the adoption.

The natural father testified that during his August 1977 visit to Anchorage he was "briefed" by friends and the child's mother that his daughter thought her stepfather was her "real" father and he should not tell her otherwise. The child called herself by her stepfather's last name. The mother told the natural father that she thought it would confuse the child unnecessarily to try to explain the truth because the child was too young to understand and the natural father was visiting for only one week. The natural father cooperated with this request because he was concerned that he might harm the child emotionally if he did not go along with the mother's suggestions. The mother felt it was her position to tell the child the truth when she thought the child was ready. At the hearing, the mother testified that the child had just recently reached the ability "to even halfway understand the concept."

During the natural father's August 1977 visit, he was told by the stepfather that the stepfather wanted to adopt the child. When the natural father said he would not consent to this, the stepfather said that he was taking very good care of the child financially and the natural father's money and presence in Alaska were not welcome. After the visit, the natural father did not communicate with the child's mother directly, but he called mutual friends in Anchorage to obtain information about his daughter. He testified that he set aside funds monthly for the child in his Denver bank account. He talked with friends who lived in Anchorage about setting up a local trust fund for the child's benefit, but he had not set up such a fund at the time of the adoption proceedings.

1. Civil Rule 53(d)(2) provides in part:
   In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. ... The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.
   The superior court did not find that the master's findings of fact were clearly erroneous. Therefore, we review the findings of the master.

2. The practical effect of the superior court's action was to dismiss the stepfather's petition, though this was not specifically stated in the order. Under AS 20.15.040, the consent of the natural parents is necessary unless excused under AS 20.15.050. No other grounds for excusing the natural father's consent were argued. To properly dispose of this case, the trial court should have ordered a dismissal of the petition.

3. The natural father was granted visitation rights, but the specific provisions agreed to by the parties and approved by the divorce court do not appear in the record before this court.

On appeal, the stepfather argues that the superior court's order was clearly erroneous because while the master's findings accepted by the superior court support a finding of justifiable cause for the natural father's failure to communicate, they fail to support any justifiable cause for his failure to pay child support. The stepfather further argues that the master incorrectly relied on evidence of the natural father's subjective intent rather than on evidence of his conduct. He urges us to narrowly construe AS 20.15.050(a)(2) to limit the absent parent's power to prevent an adoption that may be in the best interests of the child.

In her report, the master noted that the natural father's three annual trips to Anchorage had been a financial burden to him. The mother had received most of the couple's property in the divorce settlement. The proceeds from one parcel of realty which she retained were to be divided between her and the natural father and, if sold, his support payments were to be excused for a year. The master noted that the natural father was "overwhelmed with" the mother's request that he not tell his daughter that she was his child. Further, he was told by the stepfather that they did not want him to return to Anchorage and that they did not need the support payments. The master concluded:

> [T]aking into consideration the location of the father and the adoptee, the age of the adoptee, the request of the mother to the father not to reveal his true identity appears to me to be justifiable cause for his failure to maintain a meaningful contact and communication with his daughter. It is understandable that in view of her tender age, natural father would not wish to upset her with this knowledge and left it to the judgment of the mother to re-

veal the true facts. Written communication would not have meant a great deal between an almost "stranger" and a young child.

The master found the natural father's conduct justified when he failed to "communicate and/or pay support."

We address first the stepfather's arguments concerning the construction of the statutory provision. AS 20.15.050(a)(2) permits adoption without a natural parent's consent when he or she has abandoned the child within the meaning of the statutory provision.[4]

The stepfather argues that we should not construe this statute to allow a defaulting parent, by merely withholding consent, to prevent an adoption that might be in the best interests of the child. He urges that, wherever possible, petitions based on AS 20.15.050(a)(2) should be allowed to progress to a determination by the court "of what arrangement would best serve the interests of the child." This construction of the statutory provision is inconsistent with our previous decisions.

In interpreting AS 20.15.050(a)(2), we have required that it be strictly construed in favor of a natural parent. *In re Adoption of K.M.M.*, 611 P.2d 84, 87 (Alaska 1980). We have consistently held that

> adoption consent provisions are designed to protect the natural rights of parents to custody, society, comfort, and services of the child.... [P]arents should not be deprived of the fundamental rights and duties inherent in the parent-child relationship except for "grave and weighty reasons."

*Id.* (citation omitted). *See In re Adoption of L.A.H.*, 597 P.2d 513, 516 n.8 (Alaska 1979); *Delgado v. Fawcett*, 515 P.2d 710,

---

4. Prior to the enactment in 1974 of AS 20.15.-050, the natural parent's failure to support and to communicate with his or her children were grounds for dispensing with consent under former AS 20.15.040(4), which provided in part that consent was not required "from a parent whose wilful abandonment for a period of not less than 30 days preceding the filing of the petition is established in the adoption proceeding." *Adoption of V.M.C.*, 528 P.2d 788 (Alas-

ka 1974); *In re Adoption of A.J.N.*, 525 P.2d 520 (Alaska 1974). Under that statutory provision we required a two-pronged inquiry:

> [T]here must first be a finding of conduct evidencing a conscious disregard of parental obligations; secondly, the court must find that such disregard has led to the destruction of the parent-child relationship.

*Adoption of V.M.C.*, 528 P.2d at 794.

712 (Alaska 1973), interpreting former AS 20.15.040.

A court effectively terminates important parental rights when it decides that a natural parent's consent to an adoption is not required. The statutory scheme for adoption contemplates a separate determination of whose consent must be obtained before the merits of a petition for adoption are considered. The best interests of the child are not relevant to a determination of whether a natural parent's consent can be dispensed with by the court. *In re Adoption of L.A.H.*, 597 P.2d at 517 n.12; *In re Adoption of K.S.*, 543 P.2d 1191, 1194 (Alaska 1975).

The stepfather's argument that adoption "is not a foregone conclusion" at this initial stage does not address the issue of whether there are "grave and weighty reasons" for depriving a natural parent of the fundamental rights inherent in the parent-child relationship. It makes little sense to summarily dispense with a natural parent's consent at the initial stage of the adoption proceedings because that parent may be able to show that adoption would not be in the best interests of the child.

We now turn to the standard of proof required under AS 20.15.050(a)(2). The natural father argues that the stepfather had the burden of proving by clear and convincing evidence that the natural father's omissions were not justified in this case.

The "clear and convincing" standard is applied by statute to the termination of parental rights in public custody proceedings when a minor is found to be a "child in need of aid." AS 47.10.080(c)(3). Likewise, we applied this standard of proof in an earlier adoption case in which we considered the requirements for dispensing with the natural parent's consent under former AS 20.10.040(6) because of the parent's unfitness. In so doing, we focused on the coercive termination of parental rights as the reason for the high standard. *In re Adoption of K.S.*, 543 P.2d at 1195.

We believe the same high standard is appropriate for proceedings brought under AS 20.15.050(a)(2). Accordingly, we hold that the adoptive parent has the burden of proving by clear and convincing evidence that the natural parent failed significantly to communicate with or to provide support for the child.[5] Because only the natural parent could explain why he or she failed to communicate with or to provide support for the child, fairness requires that he or she then bear the burden of coming forward with evidence of a justifiable cause for such omissions before justification becomes an issue. *See* 9 J. Wigmore, Evidence § 2486 (3d ed. 1940). Thereafter, the burden of proving by clear and convincing evidence that the natural parent's omissions were not justified rests with the adoptive parent. On review, we will subject the findings to the clearly erroneous test generally used for review of questions of fact.

The stepfather challenges the reliance of the master on "subjective" evidence of the natural father's reasons for failing to communicate with his daughter and to send support payments. We previously held that former AS 20.15.040(4) contemplated an objective standard of abandonment based on the *conduct* of the non-consenting parent rather than a subjective

---

**5.** The consent provisions of adoption statutes in other jurisdictions vary greatly. We note that other courts recognize a substantial burden is placed on the adoptive parent when he or she is required to prove by clear and convincing evidence that the natural parent failed in a particular respect and, also, that the failure was unexcused. Nonetheless, a high standard of proof is required due to the importance of parental rights. *See, e. g., Harper v. Caskin,* 580 S.W.2d 176, 178–79 (Ark.1979); *Solomon v. McLucas,* 382 So.2d 339, 345–46 (Fla.App. 1980); *Pyatt v. Pyatt,* 88 Ill.App.3d 8, 43 Ill.

Dec. 241, 410 N.E.2d 241, 248–49 (Ill.App. 1980); *Graham v. Starr,* 415 N.E.2d 772, 774 (Ind.App.1981); *Matter of Adoption of Darren Todd H.,* 615 P.2d 287, 289–90 (Okl.1980); *Matter of Adoption of Tryon,* 27 Wash.App. 842, 621 P.2d 775, 777–78 (1980).

For a discussion of the competing concerns of the need for stability in the steprelationship and the desire to maintain the deep parental bonds of the child and the natural parent, see Note, *Stepparent Custody: An Alternative to Stepparent Adoption,* 12 U.C.D.L.Rev. 604 (1979).

standard based on intent. *In re Adoption of V.M.C.*, 528 P.2d 788, 792–93 (Alaska 1974); *In re Adoption of A.J.N.*, 525 P.2d 520, 523 (Alaska 1974). The trier of fact properly could rely on the verbal expressions of the absent parent's subjective intent "in contextual and interpretive reference to his actual situation and conduct." *Adoption of V.M.C.*, 528 P.2d at 794. We take a similar stance in deciding whether a parent has "justifiable cause" for conduct under AS 20.15.050(a)(2). Evidence of subjective intent may be admitted to show what the "cause" for a parent's course of action was, but whether the cause was justifiable must turn on the court's determination of what grounds are objectively acceptable.

■ In this case, the master based her decision on the natural father's cooperation with the mother's request that he not confuse his daughter about who her "real" father is until she was old enough to understand. The evidence of objective facts that justified the natural father's failure to communicate with his daughter consisted of the testimony of the natural father and the mother that (1) he was told by friends, the mother, and the stepfather not to confuse the child; (2) he was told not to return to Alaska; (3) he consulted a child psychiatrist about his fear that his interference with the mother's plans would upset the child emotionally; (4) he remained informed about his daughter through friends in Anchorage; (5) he lived at a great distance from the child; and (6) meaningful communication with such a young child could not be accomplished by letter or telephone without the mother's cooperation. Though the natural father could have been more enterprising, in the circumstances of this case we cannot say that the master's determination that his failure to communicate with his daughter was justified was clearly erroneous. His testimony was unimpeached and the master had the opportunity to observe the witnesses.

The record reveals the following evidence that the natural father did not fail significantly without justifiable cause to provide support for his daughter: (1) he was encouraged by the stepfather not to send support; (2) the mother retained a parcel of realty, the proceeds from the sale of which would excuse support payments for one year; and (3) the natural father monthly set aside funds for the child in a Denver bank account. In *In re Adoption of K.M.M.*, 611 P.2d 84, 85–87 (Alaska 1980), we held that a father did not fail to provide support for his children within the meaning of AS 20.15.050(a)(2) when he placed the support money in a savings account in trust for the children rather than sending monthly payments to the mother.[6]

Though the natural father's testimony that he set aside the funds and wished to open a trust account in Anchorage was the only evidence presented at the hearing to show that he had discharged his obligation to provide for his daughter's support, his testimony was unimpeached. Admittedly, this would ordinarily be insufficient evidence to show that the natural father continued to provide support for the child when an accounting is not sent to the mother and

6. We note that K.M.M.'s natural father opened a separate savings-trust account for the benefit of his children, though the evidence presented at trial did not establish the exact date the account was opened. The evidence showed, however, that the amount in the account was equivalent to the amount of support he would have paid for the same period. The mother did not have access to the account, but she was informed of the account by letter from the natural father's attorney. Her attorney answered, stating that the mother did not agree with this action, but no demand for payment of the arrearages was made. We held that the establishment of the account was a permissible way to discharge the support obligation in light of the natural father's previous diligence in sending payments, the mother's failure to demand that the money be sent to her instead, and the reasonable belief of the natural father that the children were receiving adequate care. *In re Adoption of K.M.M.*, 611 P.2d 84, 86–87 (Alaska 1980).

In the case before us, the natural father testified that the mother was aware of the fund he had set aside for his daughter at least one and a half years prior to the adoption proceedings. No demand for payment of arrearages was made by the mother.

she is not given access to the funds for the needs of the child. The master, however, found justifiable cause for the natural father's failure to send support payments to the mother. The master had the opportunity to observe the witnesses and we affirm her decision in this case. The natural father chose an alternative method of providing support and the evidence clearly shows that the child's daily needs were more than adequately met.

In affirming the decision in this case, we do not condone the absent parent's selection of alternative means of providing support for and communicating with his or her child rather than those methods specified in the divorce proceedings. We recognize that the custodial parent has the right to direct the child's activities and to make decisions regarding the care of the child that are often beyond the absent parent's control. This does not excuse the absent parent's obligations to provide support for and meaningful contact with his or her child. We merely affirm the approval of the natural father's attempts to cooperate with the mother, while setting aside funds and maintaining contact with family friends, where an attempt to do otherwise would likely worsen an already difficult situation that was destined to be of limited duration.

The decision of the trial court is AFFIRMED.