In the Matter of the ADOPTION OF MIS-
SY M. and Cameron H., Minor Children
Under the Age of Eighteen Years.

No. S–11898.

Supreme Court of Alaska.

April 14, 2006.

**646** ▮▮▮        ▮▮▮▮▮▮▮▮▮▮▮

Megan R. Webb, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellant State of Alaska.

Bryan T. Schulz, Schulz & Skiles, Ketchikan, for Appellees R. and D. Donne.

Before: BRYNER, Chief Justice,
MATTHEWS, EASTAUGH, FABE, and
CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

The State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) appeals the grant of petitions by R.D. and D.D. (the Donnes) to adopt minor children M.M. (Missy) and C.H. (Cameron).[1] The Donnes had previously been licensed by OCS as foster parents. But OCS had received substantiated reports of abuse occurring in the Donnes' home and the Donnes relinquished their foster care license in 2004. OCS withheld its consent to the adoption based on these reports and the lapse of the license. The superior court found that OCS's withholding of consent was unreasonable as against the children's best

interests. Because the incorrect test was used to determine the reasonableness of OCS's withholding of consent, we vacate the order of adoption and remand the case for further findings.

## II. FACTS AND PROCEEDINGS

The Donnes, R.D. and D.D., were first licensed as foster parents in 1997. Their license was modified over the years to allow up to seven foster children into their home. In total they cared for about thirty children as foster parents.

In 2000 OCS received a report alleging inappropriate methods of discipline used by the Donnes, including placing Tabasco sauce on the children's tongues, grabbing the children, and pulling the children's hair. OCS investigated these allegations by interviewing each of five children separately. As a result of this report, R.D. was required to and did complete a plan of correction. The Donnes retained their foster home license and OCS continued to place children with them.

In May 2001 OCS received a second report alleging that the Donnes were still using Tabasco sauce as punishment and pulling the children's hair. Different children were allegedly involved. The report was unconfirmed because the child telling the story was too young to confirm the sequence of events.

In December 2001 OCS assumed emergency custody of Missy and Cameron in a child in need of aid (CINA) case. Missy and Cameron were placed with the Donnes on December 18, 2001. At that time, Cameron was approximately six months old and Missy was approximately eight years old. Cameron remained with the Donnes until his removal in May 2004. Missy was at one point returned to her mother in an attempt to reunify the family; when that attempt failed, she was returned to the Donnes.

In April 2004 OCS received a third report alleging that inappropriate discipline was being practiced in the Donnes' home. The allegations were first brought to OCS's attention by another foster parent who occasionally took care of foster children who were living with the Donnes on weekends. The

1. Pseudonyms have been used to protect the privacy of the parties.

report included a list of disciplinary methods used by the Donnes, including grabbing a child under the chin so hard as to leave a bruise; pulling hair; calling the children belittling names; requiring children to run back and forth between the house and a pole at the edge of the yard; and forcing them to stand and touch their toes until their legs ached. There was also an allegation that one of the children, who was frightened of showers, was thrown into a shower in the middle of the night if he wet the bed. At this time, the Donnes had seven foster children in their care including Missy and Cameron, and D.D.'s teenage daughter was also living with them.

OCS investigated by interviewing five of the children and four adults. Because each child's story was consistent, OCS considered the allegations to have been substantiated. R.D. was also interviewed as part of the investigation; initially, she denied any wrongdoing, but she subsequently admitted to some of the conduct, maintaining that she thought her methods permissible as long as they did not result in bruises.

As a result of this investigation, OCS removed all foster children from the home. R.D. was told that she would retain her foster care license if she completed another plan of correction. The plan was to include a mental health evaluation of R.D. as well as in-home services offered through a parenting program. In response, R.D. sent a letter refusing to participate in a mental health evaluation and stating that she did not want to be a foster parent any longer. The state then "closed" the Donnes' foster care license in a letter dated June 15, 2004. In the letter, OCS explained to R.D. that if the Donnes wished to become foster parents again, they would have to complete the plan of correction before the license was reissued.

The Donnes filed their petition to adopt Cameron on June 15, 2004. They filed their petition to adopt Missy on August 20, 2004.[2] When questioned why the petitions were filed separately, R.D. explained that they had been told that Cameron was being sent to Canada and that they had to act on a petition to adopt him right away.

A two-day evidentiary hearing was held on November 22 and 24, 2004, the purpose of which was to determine whether the Donnes were "unfit to be parents." The superior court judge commented during the hearing that he did not consider the reports of discipline used by the Donnes to be unusual or substantially different from what he had experienced as a child. At the end of the hearing, the trial court found that the Donnes were not "unfit to be parents." But because the parents of Missy and Cameron had not yet consented to the adoption, the superior court did not consider the hearing an adoption hearing and the issue of OCS's consent was not decided.

Subsequent to the evidentiary hearing, the mother gave her consent to the adoption petitions for both children on November 29, 2004. The mother relinquished her rights to both children on December 6, 2004 and the children's fathers' rights were terminated on the same date. A home study, deemed acceptable by the superior court, was undertaken by an expert hired by the Donnes' attorney prior to the adoption hearing. The adoption hearing was held on February 22, 2005.

At the adoption hearing, testimony was taken from the person who performed the home study, the grandmother of the children, R.D., and a mental health therapist as witnesses on behalf of the Donnes. OCS called an OCS worker and Michelle Simpson, with whom Missy was living at the time. Missy was also called to testify. The two main issues before the court were OCS's consent and Missy's consent.

As to Missy's consent, because she was over ten years of age at the time of the hearing, her consent is required under AS 25.23.040(5) "unless the court in the best interest of the minor dispenses with the mi-

---

**2.** The Donnes also filed a petition to adopt the third sibling, D.L. (David), who is an Indian child whose placement is subject to the provisions of the Indian Child Welfare Act. Since a blood relative was interested in adopting David, the Donnes withdrew their petition. The proposed relative adoption has since fallen through and the Donnes have re-filed their petition. The status of that adoption is not at issue in this case.

nor's consent." Missy had been inconsistent about whether she wanted to be adopted by the Donnes. The superior court considered it to be in her best interest to dispense with her consent to the adoption.

As to OCS's consent, the superior court recognized that OCS was concerned about the children being adopted by a family which had lost its foster care license. The superior court determined that although the Donnes did not meet the standards OCS applied to foster parents, "those standards are a different set of standards" from those to be applied to adoptive parents. The superior court explained that the standards to be applied to adoptive parents were less stringent than those applied to foster parents. The superior court also concluded that the best interests of the children, particularly their interest as siblings to remain living together, would be best served by granting the adoption petitions. The superior court thus found by clear and convincing evidence that OCS had unreasonably withheld its consent to the adoption.

OCS filed a motion for reconsideration which the superior court denied. In its denial, the superior court recognized that OCS "is free to set any standards it pleases on its contractors (foster parents)" but concluded that this right "does not extend to adoptive parents." The superior court noted that it must "use its own reading of the statutory standards for adoptions" and that this "requirement cannot simply be delegated to OCS." The superior court was also unconvinced that the children's adoption by the Donnes would lead to "some sort of harm, much less irreparable harm," particularly when the alternative is "separate and likely temporary placements for the uncertain period required to process appeals." OCS now appeals.

## III. STANDARD OF REVIEW

■ The superior court "is given broad discretion in custody awards so long as the best interests of the child are served." [3] An adoptive placement determination should therefore be reversed only when the record as a whole reveals an abuse of discretion or when controlling factual findings are clearly erroneous.[4]

■ A factual finding is found to be clearly erroneous when a review of the record leaves us with the definite impression that a mistake has been made.[5] Whether the trial court's factual findings satisfy the requirements of the statute is a question of law that we review de novo, determining the rule of law "in light of precedent, reason, and policy." [6]

■ We will find an abuse of discretion if the trial court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others." [7]

## IV. DISCUSSION

■ The primary question presented in this case is the test by which the trial court should review the reasonableness of a decision by OCS to withhold consent to an adoption. Consent by OCS to the adoptions in this case was required under AS 25.23.040(a)(3) because OCS had legal custody of Missy and Cameron as a result of a CINA case. Alaska Statute 25.23.040(a)(3) provides:

(a) Unless consent is not required under AS 25.23.050, a petition to adopt a minor may be granted only if written consent to a particular adoption has been executed by
. . . .
(3) any person [8] lawfully entitled to custody of the minor or empowered to consent[.]

3. *Elton H. v. Naomi R.,* 119 P.3d 969, 973 (Alaska 2005); *see also* AS 25.24.150(c).

4. *In re Adoption of Bernard A.,* 77 P.3d 4, 7 (Alaska 2003).

5. *Fardig v. Fardig,* 56 P.3d 9, 11 (Alaska 2002).

6. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

7. *Fardig,* 56 P.3d at 11.

8. That the "person" in subsection (a)(3) includes OCS was established by *In re W.E.G.,* 710 P.2d 410, 412 n. 1 (Alaska 1985).

But the requirement of consent by OCS could be excused under AS 25.23.050(a)(8) if the trial court determined, after examining the written reasons for withholding consent, that OCS was "withholding consent unreasonably." [9]

The Donnes, as petitioners for adoption, have the burden of proving by clear and convincing evidence that OCS withheld its consent unreasonably.[10] But because only OCS can explain why it withheld consent, OCS must first provide its reasons, in writing,[11] for withholding consent.[12] Thereafter, the prospective adoptive parents have the burden of proving by clear and convincing evidence that OCS's decision to withhold consent was unreasonable. The superior court properly applied the clear and convincing evidence standard.

But in this case, the proper test to determine whether OCS was unreasonable in withholding its consent to the adoption was not used. In its findings, the superior court focused exclusively on the best interests of the children. The superior court particularly emphasized that the adoption kept the siblings together. The Donnes add that the proposed adoption would serve the best interest factors of maintaining continuity given the ages of the children and the length of time the children have known the various parties.[13] The Donnes argue that this best

interests analysis is sufficient to deem OCS's withholding of consent to be unreasonable. We disagree and hold that the statute requires an inquiry different from and independent of the best interests analysis.

The statutory language guiding our review of OCS's withholding of consent to adoptions is provided in AS 25.23.120(c). That provision expressly requires the trial court to engage in two inquiries, one to determine whether "the required consents have been obtained or excused" and the other to determine whether "the adoption is in the best interest of the person to be adopted." [14] OCS argues that these two steps are separate and that focusing only on the best interests of the children conflates the two prongs. We agree.

To explain why, we turn to our decisions in the parental consent context. There we observed that "[t]he statutory scheme for adoption contemplates a separate determination of whose consent must be obtained before the merits of a petition for adoption are considered. The best interests of the child are not relevant to a determination of whether a natural parent's consent can be dispensed with by the court." [15] In *In re Adoption of L.A.H.*, we also rejected the contention that a father's consent could be dispensed with merely because doing so would be in the best interests of the child.[16]

---

**9.** The relevant provision of AS 25.23.050(a) is as follows:

> (a) Consent to adoption is not required of
>
> . . . .
>
> (8) a guardian or custodian specified in AS 25.23.040(a)(3) or (4) ... who, after examination of the guardian's or custodian's written reasons for withholding consent, is found by the court to be withholding consent unreasonably[.]

**10.** AS 25.23.050(a)(8). In Alaska, the clear and convincing standard of the CINA statutes has been imported into the adoption statutes by the courts. *See In re Adoption of K.S.*, 543 P.2d 1191, 1195 (Alaska 1975).

**11.** AS 25.23.050(a)(8).

**12.** *See D.L.J. v. W.D.R.*, 635 P.2d 834, 838 (Alaska 1981) (citing 9 J. Wigmore, EVIDENCE § 2486 (3d ed.1940) for the proposition that the party which can best explain why it acted or failed to act must bear the burden of providing evidence

of the reasons for its behavior before the other party is required to bear its burden of showing that reasoning to be unjustified).

**13.** The superior court stated that it was using the factors listed in AS 25.24.150(c) to delineate the contours of the best interests of the child standard.

**14.** AS 25.23.120(c) provides in full:

> (c) If at the conclusion of the hearing the court determines that the required consents have been obtained or excused and that the adoption is in the best interest of the person to be adopted, it may issue a final decree of adoption.

**15.** *D.L.J. v. W.D.R.*, 635 P.2d 834, 838 (Alaska 1981).

**16.** *In re Adoption of L.A.H.* 597 P.2d 513 (Alaska 1979). In *In re Adoption of L.A.H.*, we said "AS 20.15.120(c) [now AS 25.23.120(c)] requires the superior court to determine that the required

As OCS stands *in loco parentis* to Missy and Cameron by virtue of the CINA proceeding,[17] its consent should be treated in a manner similar to parental consent.[18]

Therefore, the two-part test in AS 25.23.120(c) requires that OCS's consent must have been excused for reasons independent of the best interests analysis. Were it otherwise, such that the unreasonableness of withholding consent were to be judged by the best interests standard, then the two-part approach of AS 25.23.120(c) would become extraneous and the inquiry reduced to whether a particular adoption was in the best interests of the child, without regard to the issue of consent. Such a reading of the statute conflicts with the general rule of statutory construction under which effect is given to all words of the statute and none are rendered superfluous.[19] Given that the statutory language clearly establishes a two-part test, it was error to conflate the two parts of the test by importing the best interests standard into the consent determination.

But our clarification of this two-part test still leaves the question of how to review the reasonableness of OCS's withholding of consent. We have not previously addressed what factors should be considered in deciding whether consent has been unreasonably withheld by OCS. But the meaning of "unreasonable" must first and foremost be defined by how closely OCS adheres to its statutorily mandated role as a protector of children when following its own rules and regulations.[20] Second, the reasonableness of OCS's decision must also be defined by the sufficiency of the investigation into the facts undertaken by OCS.[21]

■■■ Alaska Statute 25.23.050(a)(8) requires OCS to provide a written statement of its reasons for withholding consent. OCS provided an affidavit and supporting materials establishing both that a report of harm

---

consents have been obtained or excused and that the adoption is in the best interests of the child. Both of the conditions must be met." 597 P.2d at 517 n. 14. The two prongs of the test to dispense with a parent's lack of consent is analogous to the judicially established two-part test used to determine whether a parent has abandoned a child. *See In re Adoption of V.M.C.*, 528 P.2d 788 (Alaska 1974). In abandonment cases, it must be established by clear and convincing evidence that (1) the parent has engaged in conduct evidencing a conscious disregard of parental obligations and (2) that the parent-child relationship has been destroyed. *Id.* at 793. We noted that this second factor could not overcome the first, even if it were in the best interests of the child. *Id.* at 793 ("[A]bsent a sufficient finding of the requisite conduct, even a consideration of the best interests of the child and a breakdown of the parent-child relationship would be insufficient to support a finding of legal abandonment.").

**17.** AS 47.10.084(a).

**18.** When a statute explicitly mandates the child protection agency's consent, other jurisdictions have come to mixed conclusions as to whether a court may override that consent and grant the adoption in the best interests of the child. *See, e.g.*, Jane Mansey Draper, Annotation, *Adoption of Child in Absence of Statutorily Required Consent of Public or Private Agency or Institution*, 83 A.L.R.3d 373 § 3(a), § 3(b). But in Alaska, the statutory directive is clear: if the two-part test of AS 25.23.120(c) is not met, then the adoption itself fails. The court may then direct custody

arrangements of the child according to subsection .120(d) and in the best interests of the child.

**19.** *See Coughlin v. Government Employees Ins. Co. (GEICO)*, 69 P.3d 986, 994–95 (Alaska 2003).

**20.** In early cases of other jurisdictions, the statutory requirement of reasonableness has been interpreted to require reasons that are not arbitrary or capricious, *In re McKenzie*, 197 Minn. 234, 266 N.W. 746 (1936), or "fanciful," *Lee v. Thomas*, 297 Ky. 858, 181 S.W.2d 457, 461 (1944), or that do not look out for the best interests of the child, *In re Adoption of Reinius*, 55 Wash.2d 117, 346 P.2d 672 (1959). More recent cases continue to emphasize that the reasons given by the child protective agency must be of a substantive nature. *See, e.g., In re M.L.M.*, 278 Mont. 505, 926 P.2d 694 (1996) (holding that agency's refusal to consent to adoption is subject to judicial scrutiny for determination of whether that refusal was arbitrary, capricious, or unreasonable); *In re Cotton*, 208 Mich.App. 180, 526 N.W.2d 601 (1994) (holding that petitioner had burden of showing by clear and convincing evidence that child protection agency representative acted arbitrarily or capriciously).

**21.** *See, e.g., Bland v. Dep't of Children & Family Servs.*, 141 Ill.App.3d 818, 96 Ill.Dec. 122, 490 N.E.2d 1327 (1986) (determining that department withheld consent unreasonably when its investigation into the facts was inadequate); *In re Adoption of Shields*, 4 Wis.2d 219, 89 N.W.2d 827 (1958) (holding that it would be arbitrary and capricious to withhold consent if the guardian had no reasonable basis in fact for believing that the proposed adoption would be contrary to the child's best interests).

had been substantiated and that the Donnes' license had been closed. As a result, OCS argues that it is precluded from approving the Donnes as an adoptive home under 7 AAC 56.660(c). 7 AAC 56.660(c) provides, in relevant part:

(c) Except when placing a child under emergency conditions, an adoption or guardianship home may not be approved if a person in the prospective adoption or guardianship home has a disqualification described in 7 AAC 56.210(b).

7 AAC 56.210(b) provides a list of disqualifications barring persons from working or volunteering in a foster care agency. OCS contends that the Donnes are disqualified under two provisions of 7 AAC 56.210(b).

First, 7 AAC 56.210(b)(1) disqualifies a person if that person "is the alleged perpetrator of an incident of child abuse or neglect in which the division found the evidence available substantiates the allegation." In this case, two substantiated reports of harm indicated that the Donnes had physically and mentally abused children in their care. The first substantiated report resulted in R.D. being required to engage in a corrective plan. After completion of the plan, the Donnes were permitted to retain their foster care license. The second substantiated report of harm resulted in the removal of the foster children present in the home. Once again a corrective plan was required of R.D., but this time she refused to participate in the plan and the Donnes relinquished their foster license. Although the first report of harm was corrected and arguably no longer relevant for the purposes of 7 AAC 56.210(b)(1), the second report of harm was never corrected. OCS argues that the existence of an uncorrected and substantiated report of harm disqualifies the Donnes for the purposes of 7 AAC 56.210(b)(1).

Second, OCS argues that the Donnes were disqualified under 7 AAC 56.210(b)(4) because they were "the subject[s] of a prior adverse licensing action of the kind described [in] AS 47.35.120(b)(5)—(7)." [22] Then-governing AS 47.35.120(b)(5)—(7) refers to the non-renewal or revocation of a foster care license or the issuance of an order requiring immediate closure of the facility. OCS contends that because the Donnes cannot be reissued a foster care license until they complete the plan of correction that had been created after the second substantiated report of harm, they have been the subject of a prior adverse licensing action.

The Donnes respond that they do not fall within either disqualification of 7 AAC 56.210(b). First, the Donnes argue that they do not come within 7 AAC 56.210(b)(1) because their conduct did not rise to the level of "child abuse" as defined by 7 AAC 56.210(k). 7 AAC 56.210(k) states that "child abuse" is defined by AS 47.17.290(2), which provides:

"[C]hild abuse or neglect" means the physical injury or neglect, mental injury, sexual abuse, sexual exploitation, or maltreatment of a child under the age of 18 by a person under circumstances that indicate that the child's health or welfare is harmed or threatened thereby; in this paragraph, "mental injury" means an' injury to the emotional well-being, or intellectual or psychological capacity of a child, as evidenced by an observable and substantial impairment in the child's ability to function[.]

The Donnes argue that the disciplinary methods discussed in the substantiated reports of harm do not rise to the level of child abuse for the purposes of the statute. The superior court implicitly agreed with this position by indicating that it did not consider the Donnes' disciplinary methods to be particularly unusual.

But OCS is mandated by statute to make reasonable efforts to protect children [23] and its regulations do establish standards for expected behavior on the part of a foster care facility. 7 AAC 50.435(d)(3) states that children may not be punished for bed-wetting or subjected to verbal abuse and subsection .435(f) provides that corporal punishment may not be used on children under the foster facility's care. All these forms of conduct were documented in the second substantiated

---

**22.** Since repealed as part of the amendments to the CINA statutes effective July 1, 2005. Ch. 57, § 50, SLA 2005.

**23.** AS 47.05.065(2).

report of harm. By substituting its judgment on the propriety of the Donnes' disciplinary methods for that of OCS, the superior court did not defer to agency expertise.[24]

Second, the Donnes respond that they were not subjected to an adverse licensing action for the purposes of 7 AAC 56.210(b)(4) because they voluntarily relinquished their license rather than being subjected to any kind of licensing action. But although OCS never had to enforce its decision regarding the non-renewal of the Donnes' foster care license, it remains true that OCS would be forced to deny renewal if the Donnes applied for a license without completing the plan of correction.

On the issue of the foster care license, the superior court took a different approach from that proposed by OCS and the Donnes. It appeared to interpret the foster care licensing issue as a technical, employment-related decision which could be overcome by the best interests analysis. The superior court also perceived a substantial difference between the standards that applied to foster parents and adoptive parents, concluding that foster parents were expected to be "top notch" trained professionals, while parents could be held to a lower standard.

We disagree both with the trial court's view that the Donnes' lack of a foster care license is a mere technical violation and with its application of a lower standard of behavior to prospective adoptive parents. First, OCS has been given the responsibility for the review and monitoring of foster care facilities. Once OCS has taken legal custody of a child, it is responsible for "the determination of where and with whom the child shall live." [25] OCS is also given the responsibility to place the child "in a safe, secure, and stable environment" [26] and to engage in "a planning process ... to lead to permanent placement of the child." [27] Therefore the licensing actions listed in AS 47.35.120(b)(5)—(7) are more than mere technical requirements. They are closely tied to OCS's statutory responsibilities as well as the safety and security of the children in its care.

Furthermore, recent amendments to the CINA statutes under which OCS operates provide support for OCS's position that its decisions on foster care licensing are considered by the legislature to be determinative for the purposes of adoption. For example, AS 47.10.088(I) mandates that OCS first approach adult family members concerning their interest in adopting a child in OCS custody, but OCS is released from this obligation if the adult family member "is known by the department to be ineligible for a foster care license." [28] OCS is also released from its obligation to place a child with family members if it can demonstrate "good cause" for not placing a child with that relative.[29] Evidence that the person requesting placement would not qualify for a foster care license is prima facie evidence of "good cause" to deny placement.[30] Thus, since July 1, 2005 it has been made explicit in the CINA statutes that a child should not be placed for adoptive purposes with an individual or family ineligible for a foster care license.

Second, we disagree with the view that the qualifications of prospective adoptive parents are to be reviewed under a lower standard than those of foster parents. We have previously drawn a distinction between the kinds of homes into which children can be placed in a CINA proceeding as opposed to in an adoption proceeding and in so doing have held adoptive homes to a higher standard. In *In re Adoption of B.S.L.*, we stated that "[t]hrough an adoption proceeding a child

---

**24.** We review an agency's interpretation of its own regulations using the "reasonable basis" test. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992). The test is not demanding: "[W]here an agency interprets its own regulation ... a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue." *Id.*

**25.** AS 47.10.084(a).

**26.** AS 47.05.065(4)(A).

**27.** AS 47.05.065(4)(C).

**28.** The 2005 amendments added the second through fourth sentences of AS 47.10.088(I) and were effective July 1, 2005.

**29.** AS 47.14.100(e) (effective July 1, 2005).

**30.** AS 47.14.100(m) (effective July 1, 2005).

may be placed in a stable, permanent home; through a child-in-need-of-aid proceeding a child may be placed in an environment which, though uncertain, is preferable to the dangerous environment he or she occupies."[31] The reason an adoptive placement must be more stable than a CINA placement is because an adoption proceeding results in a permanent establishment of parental rights. As we have previously noted, "[a]n adoption proceeding operates to *replace* a parent, while a child-in-need-of-aid proceeding operates to *emancipate* a child from an offending parent's legal bonds."[32] Because a permanent parent-child bond is established through adoption proceedings, great care must be taken in evaluating prospective adoptive parents.

And permanency is not the only concern. OCS monitors its foster parents to ensure that children in their care are provided with reasonable safety, adequate care, and adequate treatment during the time they are wards of the state.[33] But once an adoption is complete, the adopting parents assume all the legal rights and obligations of a natural parent.[34] OCS can therefore no longer monitor the relationship between the child and the adoptive parents. Because OCS stands *in loco parentis* to the children in its custody,[35] it is "the duty of the agency to determine, to the best of its ability, that the home into which one of its children is adopted is a good home, maintained by parents of moral standing who are able to support, maintain, and educate the child."[36] It is in regard to this important role of OCS that the legislature has precluded OCS from delegating its authority to consent to adoption.[37] It is also

in fulfillment of the duties attendant on this role that OCS requires prospective parents to demonstrate attributes of emotional and economic stability not required of a foster home.[38]

In this case, then, the record establishes that OCS was precluded by its own rules and regulations from consenting to the Donnes' adoption petition and that those rules are of the sort formulated to further OCS's mandate as a promoter of the safety, security, and stability of child placements. Furthermore, OCS provided evidence of its investigations of the reports of harm sufficient to establish that its decision to withhold consent was based on a reasonable inquiry into the facts of the case. Therefore, we find as a matter of law that OCS's withholding of consent was provisionally reasonable.

But the inquiry does not end at this point. As the superior court correctly pointed out, a case may eventually arise where the specific facts warrant the adoption despite OCS's written reasons being facially reasonable in accord with the test outlined above. OCS's plans for the adoption of the child are akin to its placement decisions: both implicate agency expertise and must be accorded due deference, yet both are also subject to judicial review. In *S.S.M. v. State, Department of Health & Social Services, Division of Family & Youth Services*, we pointed out that an OCS placement decision is "ultimately a matter for superior court review."[39] We have also noted that while the CINA statutes do not allow the court itself to make a placement decision affecting a child in OCS custo-

**31.** 779 P.2d 1222, 1226–27 (Alaska 1989).

**32.** *Id.* at 1226.

**33.** AS 47.05.065(3).

**34.** *In re Pierce's Estate*, 32 Cal.2d 265, 196 P.2d 1, 3–4 (1948), *see also* 2 Am.Jur.2d *Adoption* § 170, 171.

**35.** AS 47.10.084(a).

**36.** Draper, 83 A.L.R.3d 373 § 2(a); *see also* AS 47.10.086(b) (mandating that OCS make reasonable efforts to find a permanent placement for the child if returning to the parental home is deemed not to be in the child's best interests).

**37.** AS 47.10.084(a).

**38.** Before placing a child in an adoptive or guardianship home, OCS must undertake a home study. 7 AAC 56.610(a)(4). The home study is to be undertaken according to the requirements of 7 AAC 56.660. *Id.* Section 56.660 contains a lengthy list of the proper elements that constitute a home study, including an investigation into the financial and emotional stability of the prospective parents as well as their place in the community.

**39.** 3 P.3d 342, 346 & n. 13 (Alaska 2000).

dy, the placement decision made by OCS nevertheless remains subject to judicial review.[40] Similarly, the substance of OCS's decision to withhold consent to an adoption must still be subject to judicial review.

But the question remains as to what test and standard of review is to be used, and who is to bear the burden of proof, when the court finds OCS's written reasons to be facially reasonable but simultaneously confronts facts suggesting that the adoption may still be warranted. In determining that test, we must remain aware of the deference due OCS's expertise in the provision of child protective services. Therefore, the court cannot simply substitute its own best interests evaluation in reviewing OCS's reasons for withholding consent and a more stringent standard is required.

A parallel standard that is more stringent may be found in how we have negotiated between the general preference for biological over non-biological parents in a contested custody proceeding[41] and those situations where the facts warrant an award to the non-biological parent. In Turner v. Pannick, we established that to overcome the presumption for custody in the biological parent, the non-biological parent has the burden of showing either that the biological parent is unfit or that "the welfare of the child requires it to be in the custody of the non-parents."[42] Turner further noted that the "welfare of the child" test was satisfied if the non-biological parent could show that "it clearly would be detrimental to the child to permit the parent to have custody."[43] In Evans v. McTaggart, we further established that the clear and convincing evidence standard, and not the

lower preponderance of the evidence standard, was required as to dispositive findings in either prong of the Turner test.[44] Similarly, we hold here that the presumption of deference due OCS and the bar established by its facially reasonable withholding of consent can be overcome only if the prospective adoptive parent can show, by clear and convincing evidence, that it would be clearly detrimental to the child to deny the adoption.

This standard is articulated differently and in a more stringent fashion than the best interests analysis because we wish to once again call attention to the dangers of too easily overcoming the relevant presumption. Turner warned of a standard so low as to allow a judge to overcome the presumption favoring biological parents due to his or her personal disagreement with the lifestyle or financial situation of the parents.[45] The Turner court alluded to Painter v. Bannister,[46] in which the Iowa court awarded custody to the minor's grandparents because it disapproved of the Bohemian lifestyle of the father.[47] That warning was repeated in McTaggart.[48] Similarly, the presumption in favor of deference to OCS is in danger of being too easily overcome because of the judge's personal disagreement with OCS over what constitutes the child's best interests.[49] That danger justifies the imposition of the higher standard of proof.

Indeed, there is a good reason to require a higher standard of proof in cases that implicate a presumption that favors an administrative agency of trained professionals vested with the statutory duty of acting in the best

40. In re B.L.J., 717 P.2d 376, 380 (Alaska 1986).

41. Hickey v. Bell, 391 P.2d 447, 448 (Alaska 1964) (providing the first statement of the preference in Alaska for biological parents in a contested custody proceeding unless parent is shown to be unfit or the welfare of the child requires it to be placed with the non-parent).

42. 540 P.2d 1051, 1053 (Alaska 1975).

43. Id. at 1054.

44. Evans v. McTaggart, 88 P.3d 1078, 1085 (Alaska 2004).

45. Turner, 540 P.2d at 1054–55.

46. 258 Iowa 1390, 140 N.W.2d 152 (Iowa 1966).

47. Turner, 540 P.2d at 1055.

48. McTaggart, 88 P.3d at 1085.

49. In this case, the trial judge's comment that he "didn't hear anything going on in the [Donne] household that [he] didn't either experience or observe as a child," is an example of a judge giving more weight to his own personal experience rather than deferring to OCS's expertise in the evaluation of disciplinary methods.

interests of the child.[50] Just as we require a higher standard of proof in termination of parental rights proceedings because of the irrevocable and permanent nature of those proceedings, so we should also require a high standard of proof in adoption proceedings that result in the equally irrevocable creation in the adoptive parents of rights over a child and the removal of that child from the care and monitoring of OCS.

Because in this case the proper statutory test was not used in evaluating the reasonableness of OCS's withholding of consent, and because we have determined that as a matter of law OCS's written reasons for withholding consent were provisionally reasonable in this case, a remand is necessary.[51] On remand, the superior court must determine whether the Donnes can show, by clear and convincing evidence, that it would be a clear detriment to the children to deny the adoption. In making this determination, the superior court should take into account present factual circumstances, including but not limited to the potential effects on the children of the passage of time since the adoption petitions were granted and the disciplinary methods currently being used by the Donnes.

## V. CONCLUSION

Because dispensing with OCS's consent was an abuse of discretion, the petitions to adopt are VACATED and the case REMANDED for further proceedings in light of this opinion.

---

**50.** *See, e.g.,* AS 47.10.086(b); AS 47.10.088; AS 25.23.005.

**51.** In the interim, the trial court may make custody determinations in the best interests of the child under AS 25.23.120(d). An order made pursuant to subsection .120(d) does not create a foster care arrangement and therefore the person taking interim custody does not need to have satisfied OCS's foster care licensing require-

ments. *In re Adoption of L.E.K.M.,* 70 P.3d 1097, 1102 (Alaska 2003). Although the legislature has determined that the court may not direct placement in CINA proceedings, *In re B.L.J.,* 717 P.2d 376, 379 (Alaska 1986), here subsection .120(d) provides explicit statutory authority allowing the court to direct custody decisions once the petition for adoption has failed to meet the requirements of subsection .120(c).