*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DAVID S., | ) | |
| | ) | Supreme Court No. S-14816 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-11-00273 PR |
| v. | ) | |
| | ) | O P I N I O N |
| JARED H. and CONNIE H., | ) | |
| | ) | No. 6808 – August 16, 2013 |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: Jason A. Weiner, Gazewood & Weiner, P.C., Fairbanks, for Appellant. Joseph W. Miller, Law Offices of Joseph Miller, LLC, Fairbanks, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

The superior court granted a grandfather and grandmother's petition to adopt their grandchild without the consent of the biological father. The superior court found that the father's consent was not required because he failed significantly without justifiable cause to communicate meaningfully with the child for a period of at least one year. On appeal, the father does not challenge the superior court's finding that he failed

to communicate meaningfully with the child for at least the year-long period; he instead argues that this failure was justified by: (1) his incarceration; (2) an agreement he allegedly had with the child's biological mother; (3) alleged interference by the grandparents; and (4) the totality of the circumstances. The father also argues that the superior court abused its discretion by failing to consider visitation rights and by awarding attorney's fees against him.

Because the record does not support the father's argument that his failure to communicate meaningfully with the child was justified, the superior court did not clearly err in finding that this failure was unjustified, and we affirm the superior court's finding that the father waived his right to consent to the adoption. Because the issue of visitation rights was not raised before the superior court, we hold that the superior court did not abuse its discretion in failing to consider the issue. Finally, because the superior court did not abuse its discretion in awarding attorney's fees against the father, we affirm that award.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Katie Howard[1] was born to Alicia Howard and David Smith in December 2003. Alicia was listed as the mother on the birth certificate, but David was not listed as the father. At the time of Katie's birth David was incarcerated; he has been incarcerated for the majority of Katie's life. David has never met or spoken to Katie.

David lived with Alicia in her parents' home in Fairbanks for a brief period prior to Katie's birth, but moved out in early 2003 after a dispute with Alicia's father. In September 2003 David was arrested and incarcerated in Fairbanks on forgery charges relating to an incident in Idaho. Soon after David was incarcerated Alicia obtained a

---

[1]     Pseudonyms have been used to protect the privacy of the parties.

domestic violence protective order against him. The protective order remained effective only for three weeks, as Alicia successfully requested to dissolve the order so that she could "try to build a friendship [with David] and work things out for me and the baby to be."

David was extradited to Idaho just prior to Katie's birth, and he and Alicia initially maintained contact by sending letters to one another and by talking on the telephone. Alicia sent seven letters to David in December 2003 that varied in subject matter and in tone. In one she told David she was "sick of the [b.s.]" and accused him of having an affair before he went to jail; in another she expressed her love for David and described Katie's bedroom and the birthing plan to him. In her final letter to David, sent in April 2005, Alicia told David that she still loved him but she needed to keep him "gone."

David sent three letters to Alicia in early 2004 and two in 2005, all of which were returned to sender. In the letters David expressed his excitement over Katie's birth and requested pictures of her. But David also grew frustrated over Alicia's failure to communicate and blamed her family for this lack of communication, stating, "I guess that your parents have spoken and you are listening to them." David also sent a letter directly to Katie on April 6, 2004, in which he told her that he loved her and wanted to meet her, but that he needed to get out of prison and get his act together first; this letter was also returned to sender. David mailed his final two letters to Alicia in 2005 to a post office box, noting he never received any response to the first three letters mailed to Alicia's parents' house.

Alicia and David resumed limited contact via telephone and internet in 2006 and 2008 when David was temporarily released on parole. In July 2009 Alicia sent David a message on a social networking site in which she gave him her telephone number and asked him to call her because she had "a couple of very important questions"

for him. In that same message Alicia also told David she was no longer mad at him and requested he "look [her] up" on a social networking site so he could see pictures of Katie. David did not respond or resume contact with Alicia until December 31, 2010, when he sent her a "friend" request via the social networking site. David also had contact with Alicia over a different social networking site in January or February 2011. This interaction was the last time David and Alicia ever communicated.

Alicia and Katie resided with Alicia's parents, Jared and Connie Howard, after Katie was born. Alicia married in 2005, at which point she and Katie moved out of the Howards' home. Alicia's marriage lasted just over three years, and in 2008 she and Katie moved into their own home. In 2009 Alicia was diagnosed with bipolar disorder.

Alicia died unexpectedly on March 1, 2011. Katie has lived with her grandparents, Jared and Connie, ever since. Following Alicia's death, David sent Jared and Connie a letter in which he asked to talk to them about Katie and expressed concern over Katie's "welfare and this new transition that we are all about to incur." It appears that David was released from jail in April 2012.

**B.    Proceedings**

Soon after Alicia's death, Jared petitioned the superior court to be appointed Katie's temporary guardian. Jared stated in his petition that he had been Katie's father figure for her entire life and that he and Connie planned to adopt Katie. Jared also informed the court that David was incarcerated and that David was not listed as Katie's father on her birth certificate. The court held a hearing and found that David's parental rights had been terminated or suspended because he had never had contact with Katie, had denied his paternity, and was incarcerated in another state. On March 25, 2011, the superior court appointed Jared as Katie's temporary guardian.

On May 2, 2011, while a long-term guardianship hearing was pending, the Howards petitioned to adopt Katie. Such a petition normally requires written consent from the child's father, but consent is not required if the father has failed to legitimate the child or if consent is not required under AS 25.23.050.[2] The Howards argued that David's consent was not required and moved for summary judgment on the issue of abandonment. David was found to be indigent and was appointed counsel.

In August 2011 Master Bethany S. Harbison held a two-day evidentiary hearing on the issue of whether David had waived his right to consent to the adoption. The master heard testimony from David, David's girlfriend, David's mother, and from Jared and Connie.

David testified that, although he had failed to communicate meaningfully with his daughter, he never waived his right to consent to the adoption because this failure was justified. David acknowledged that he had occasionally gone a year or more without talking to Alicia, attributing the lack of regular contact to his incarceration in a medium-security facility, to the high costs of long-distance phone calls in prison, and to the fact that his letters were returned.

---

[2] AS 25.23.050(a) provides:

Consent to adoption is not required of

(1) for purposes of this section, a parent who has abandoned a child for a period of at least six months;

(2) a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause, including but not limited to indigency,

(A) to communicate meaningfully with the child, or

(B) to provide for the care and support of the child as required by law or judicial decree.

David also cited an additional reason for his failure to communicate directly with Katie: according to David, he and Alicia had agreed that he would not communicate with his daughter while he was incarcerated. David testified that he and Alicia began discussing the agreement in September or October 2003 and "finalized" it in January of the following year. David stated that this agreement prevented him from contacting Katie or taking formal steps to legitimate her.

David provided two distinct rationales for this agreement. First, David testified that he and Alicia agreed that he would not be involved in Katie's life until he could be an active father, "[a]nd being in jail wasn't being an active father." David stated that he and Alicia decided he could have contact with Katie when he "could pay [his] own bills" and when he "grew up." Second, David explained that he and Alicia agreed that he would not have contact with Katie in order to prevent Alicia's parents from "cut[ting] her off" financially and emotionally, leaving her with no place to live. David testified that he had a poor relationship with Alicia's parents, so much so that they had threatened to "cut [Alicia] out" if she had anything to do with David. According to David, Alicia was "completely dependent on her parents" both financially and mentally because of her mental health issues.

David's girlfriend, Amanda, testified that David had not had any contact with Katie because he was incarcerated and because the letters he had sent to Alicia had been returned to sender, but that it was his "strong desire" to be in Katie's life. Amanda also testified about her own relationship and communication with David. Amanda testified that she and David met in 1993 and began dating soon after he reinitiated contact with her via internet in late 2010 while he was on work release from prison. Amanda stated that the amount of contact she had with David varied depending on his level of incarceration: when David was on work release, they communicated by internet several times a week and by telephone every other day; when David was incarcerated in the

medium-security facility, they communicated by telephone at least every other week and by letter every four days or so.

David's mother, Jane, testified that she met Alicia in 2002 before Alicia became pregnant. Jane described a brief conversation she had with Alicia during which Alicia stated that she was angry at David and did not want his name to appear on the birth certificate. Jane also asserted that Alicia called her several years later to ask her to pass along the message to David that she was going to be married to another man, she did not want David to contact her, and she did not want any interference from David's family. Jane testified that Alicia had additionally stated that she was afraid that, if she continued to see David, her parents would kick her out of the house and stop providing her with financial support. Jane testified she had never heard firsthand from Alicia that she and David had an agreement that he would not contact Katie, but that David had mentioned the agreement to her by November 2003. Jane stated she did not personally feel that she could contact Katie and that Alicia was very volatile because of her mental disorder.

Jane also testified about her own contact with David. Jane stated that she talked to David at least once a week throughout his incarceration, and the only time she was completely unable to contact him was when he was on lockdown.

Connie Howard testified that she initially liked David and allowed him to live in her home, but that her feelings toward him changed because of his poor work ethic and because he lied a lot. Connie asserted that David stole her expensive camera and, when Jared subsequently asked David to leave the house, David cursed her out. Connie explained that she would have been willing to give David a second chance, but he never tried to communicate with her again.

Connie also testified that her daughter was not financially dependent on her or her husband. Connie stated that Alicia moved out of her parents' home when she married in 2005 and never moved back. Connie acknowledged that she and her husband

paid for many of Katie's expenses, including her private schooling, her school clothes, her gymnastics, and food for her pets, but they rarely gave money directly to Alicia.

Jared testified that he initially allowed David to live with the family, but after moving in David forged one of his checks, stole his credit card, and made fraudulent charges. Jared testified that he told David that he needed to straighten his life out and be "a productive citizen in society," but David failed to act accordingly, so Jared asked him to leave.

Jared testified he and his wife provided Alicia with about $4,000 per year, most of which was spent on Katie. According to Jared, Alicia was not completely dependent on him and his wife: Alicia was consistently employed until her marriage in 2005, and she relied on Section 8 housing and food stamps for the two years preceding her death because her bipolar disorder prevented her from working. Jared testified that he would never "cut [his] children off." Jared also testified that even though David knew the Howards' address and telephone number, David had never contacted Katie, and the 2011 letter was the first time David had tried to contact the Howards since Katie's birth.

At the conclusion of the hearing the master declined to recommend to the superior court that summary judgment be granted, but she found that David had failed to legitimate Katie and that David had failed significantly without justifiable cause to communicate meaningfully with Katie for a period of at least one year. The master therefore concluded that David's consent to the adoption was not required. At a subsequent hearing, which David was not allowed to attend,[3] the master found that it was in Katie's best interests to be adopted by her grandparents. The master entered her findings of fact and recommendation to the superior court on October 11, 2011.

---

[3] The master determined that, given her earlier finding that David's consent to the adoption was not required, David was no longer a party to the adoption and was precluded from attending the adoption hearing.

On June 7, 2012, Superior Court Judge Paul R. Lyle entered a 28-page decision adopting the master's findings in part and granting the petition for adoption. Unlike the master, the superior court found David had legitimated Katie pursuant to AS 25.20.050(a)(4). But the superior court agreed with the master that David's consent to the adoption was not required because David had failed significantly without justifiable cause to communicate meaningfully with Katie for a period of at least one year. The superior court subsequently determined that the adoption was in Katie's best interests and granted the Howards' petition for adoption. David filed a motion for reconsideration, which the superior court denied.

Thereafter, the Howards moved for attorney's fees and costs pursuant to Alaska Civil Rule 82. The Howards argued that they were entitled to an enhanced fee award because their attorney had made efforts to minimize fees and because David had pursued unreasonable claims. The superior court rejected the Howards' request for an enhanced fee award but granted their motion in part and awarded them 22.5% of their actual allowed attorney fees, or $2,790.56.

David appeals.

## III.  STANDARD OF REVIEW

We review the superior court's factual findings in an adoption proceeding for clear error.[4]  "A factual finding is clearly erroneous 'when a review of the record leaves the court with a definite and firm conviction that the superior court has made a

---

[4]     *In re Adoption of S.K.L.H.*, 204 P.3d 320, 324 (Alaska 2009) (citing *In re Adoption of Missy M.*, 133 P.3d 645, 648 (Alaska 2006)).

mistake.' "[5]  We review questions of law de novo,[6] applying our own independent judgment and "adopting the rule of law that is 'most persuasive in light of precedent, reason and policy.' "[7]

The findings of a master that are adopted by the superior court are considered the findings of that court.[8]  The superior court's factual findings enjoy particular deference when they are based primarily on oral testimony because the superior court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence.[9]

The superior court's award of attorney's fees is reviewed for abuse of discretion.[10]  "We will reverse a ruling for abuse of discretion only when we are left with a definite and firm conviction, after reviewing the entire record, that the [superior] court erred."[11]

---

[5]     *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)).

[6]     *Osterkamp v. Stiles*, 235 P.3d 193, 195-96 (Alaska 2010) (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[7]     *Id.* (quoting *Kinnard v. Kinnard*, 43 P.3d 150, 153 (Alaska 2002)).

[8]     Alaska R. Civ. P. 52(a).

[9]     *William P. v. Taunya P.*, 258 P.3d 812, 814 (Alaska 2011) (quoting *Misyura v. Misyura*, 242 P.3d 1037, 1039 (Alaska 2010)) (quotation marks omitted); *see also Bowman v. Blair*, 889 P.2d 1069, 1072 n.5 (Alaska 1995) ("Due regard shall be given to the opportunity of the master to judge the credibility of the witnesses.").

[10]     *C.L. v. P.C.S.*, 17 P.3d 769, 772 (Alaska 2001).

[11]     *Lentine v. State*, 282 P.3d 369, 376 (Alaska 2012) (quoting *Willoya v. State, Dep't of Corr.*, 53 P.3d 1115, 1119 (Alaska 2002)) (quotation marks omitted).

## IV.   DISCUSSION

### A.   David Waived His Right To Consent To The Adoption.

#### 1.   David did not communicate meaningfully with Katie for a one-year period.

Ordinarily both parents of a minor child must consent to the child's adoption.[12] The father's consent is normally required "if the father was married to the mother at the time the minor was conceived or at any time after conception, the minor is the father's child by adoption, or the father has otherwise legitimated the minor under the laws of the state."[13] However, AS 25.23.050(a) provides that consent is not required of "a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause . . . to communicate meaningfully with the child."[14] This provision "should be strictly construed in favor of the [biological] parent and against a finding that the failure to communicate was without justifiable cause."[15] The adoptive parent must prove by clear and convincing evidence that the biological parent failed significantly to communicate meaningfully with the child for at least one year.[16] If the adoptive parent meets this burden, the burden of production shifts to the biological parent to come forward with evidence of a justifiable cause for the

---

[12]   AS 25.23.040.

[13]   AS 25.23.040(a)(2).

[14]   AS 25.23.050(a)(2)(A).

[15]   *In re Adoption of B.S.L.*, 779 P.2d 1222, 1224 (Alaska 1989) (citing *In re Adoption of K.M.M.*, 611 P.2d 84, 88 (Alaska 1980)).

[16]   *In re D.J.A.*, 793 P.2d 1033, 1037 (Alaska 1990) (citing *D.L.J. v. W.D.R.*, 635 P.2d 834, 837 (Alaska 1981)).

failure to communicate.[17]  If the biological parent meets this burden of production, the adoptive parent must then prove by clear and convincing evidence that the biological parent's failure to communicate was without justifiable cause.[18]

The superior court found that David had legitimated Katie,[19] but that the Howards "established by clear and convincing evidence that there was a one year period where there was no meaningful communication by [David] with [Alicia] or [Katie]." The court found that David meaningfully communicated in 2004 and 2005 by sending letters to Alicia from jail, but that after 2005 David "sent no messages intended for [Katie], never asked to speak to [Katie], and had only occasional, fleeting contact with [Alicia] by telephone or social media between 2006 and the filing of this adoption petition."

There appears to be no dispute between the parties about whether David failed to communicate meaningfully with Katie after 2005.  On appeal David does not argue that the superior court erred in finding that he failed to communicate meaningfully with Katie; he instead contends that the court erred in finding that this failure lacked justifiable cause.  We therefore affirm the superior court's undisputed finding that David did not communicate meaningfully with Katie for a one-year period beginning in 2005.

---

[17]     *Id.* (citing *D.L.J.*, 635 P.2d at 837).

[18]     *Id.* (citing *D.L.J.*, 635 P.2d at 837).

[19]     Although the master found otherwise, the Howards do not challenge the superior court's finding that David legitimated Katie.

**2.** **The superior court did not clearly err in finding that David's failure to communicate meaningfully with Katie was without justifiable cause.**

"A parent has the duty to make reasonable efforts to locate and communicate with his or her child."[20] A parent's failure to communicate with his child is justified only if his "efforts to communicate were objectively reasonable in light of the existing circumstances."[21] But "[t]he long-established and continuing rule in Alaska is that absent the element of willfulness, a parent does not lose the right to consent [to an adoption] under AS 25.23.050(a)(2)."[22]

David argues that four separate grounds justified his failure to communicate meaningfully with his daughter: (1) he was incarcerated during Katie's entire life; (2) he had a prior agreement with Alicia that prohibited him from communicating with Katie; (3) Alicia's parents interfered with his communication attempts; and (4) the totality of the circumstances barred meaningful communication.

The superior court found that David adduced evidence supporting the first two justifications; the Howards therefore bore the burden of proving by clear and convincing evidence that David's incarceration and alleged prior agreement with Alicia did not provide justifiable cause for his failure to meaningfully communicate with Katie.[23]

---

[20] *In re Adoption of B.S.L.*, 779 P.2d at 1224 (citing *E.J.S. v. State, Dep't of Health & Soc. Servs.*, 754 P.2d 749, 751 (Alaska 1988)).

[21] *Id.* (citing *D.L.J.*, 635 P.2d at 839).

[22] *In re Adoption of J.M.F.*, 881 P.2d 1116, 1118 (Alaska 1994).

[23] *See In re D.J.A.*, 793 P.2d at 1037.

### a. The superior court did not clearly err in declining to find that David's incarceration justified his failure to communicate meaningfully with Katie.

David argues that the fact that he was incarcerated for Katie's entire life provides sufficient justification for his lack of meaningful communication with his daughter. David argues that it was "uncontested that he could not come to Fairbanks, was limited where he could go . . . , and that he could not be a father or support [Katie] under the conditions placed on him by the penal system."

David cites to our decision in *R.N.T. v. J.R.G.* for the proposition that "neglect of parental duties caused by imprisonment is not necessarily wilful and thus does not inevitably result in the loss of a parent's right to consent."[24] David argues that, like the defendant in *R.N.T.*, his incarceration precluded meaningful communication with his daughter and therefore justified his failure to communicate.[25]

David's reliance on *R.N.T.* is misplaced. In *R.N.T.*, we considered whether a father had justifiable cause for failing to communicate meaningfully with his children, where the father's attorney advised him not to write to his children or their mother while he was in prison and his parole officer forbade him from communicating with his children once he was released, except through a third party.[26] We ruled that imprisonment does not necessarily preclude a parent from communicating with his children, but where it does, "the failure to communicate is properly considered non-wilful

---

[24]  *R.N.T. v. J.R.G.*, 666 P.2d 1036, 1039 (Alaska 1983).

[25]  *See id.*

[26]  *Id.* at 1038.

and thus justifiable cause."[27] Under this standard, we held that the circumstances of the father's incarceration and parole provided justifiable cause.[28]

Three years later in *In re J.J.J.*, however, we adopted the *R.N.T.* dissent's position and ruled that, where the terms of a parent's imprisonment and parole effectively prevent the parent from having contact with his or her children, "[t]he issue that must be addressed is whether the constraints imposed on [the parent] were the result of his own conduct, in which case his failure to communicate would not be justifiable, or were instead the result of circumstances over which he had no control."[29]

Under the *In re J.J.J.* standard, David's incarceration cannot justify his failure to communicate meaningfully with Katie because that failure was due to David's own conduct and subsequent incarceration. David was repeatedly granted parole and placed on work release following Katie's birth, but he continually violated his parole or received new charges. Thus, any constraints imposed on David resulted from his own conduct and from circumstances over which he had control.

Moreover, even if *In re J.J.J.* did not foreclose David's argument, *R.N.T.* would not provide support because ample evidence in the record clearly and convincingly established that the circumstances of David's incarceration did not prevent him from having contact with Katie.[30] When David was on work release in late 2010 and early 2011 he was able to form a new romantic relationship and maintain regular internet

---

[27] *Id.* at 1039.

[28] *Id.*

[29] *In re J.J.J.*, 718 P.2d 948, 953 (Alaska 1986) (quoting *R.N.T.*, 666 P.2d at 1041 (Compton, J., dissenting)).

[30] *See R.N.T.*, 666 P.2d at 1039 ("Of course, imprisonment does not necessarily preclude a parent from communicating with his children.").

and phone communication with his girlfriend. David had only limited internet communication with Alicia and no communication with Katie during this period.

David also testified that after Alicia contacted him via social media in 2009 and asked him to contact her so he could see pictures of Katie, he made no attempt to respond until December 2010 when he "friended" her on a social networking site. David attributed his lack of response to his incarceration, stating he "got rolled up from that [medium-security] facility because [he was] denied parole, and wasn't able to have contact with her until . . . early this year." However, David was able to maintain regular contact with his mother and girlfriend when he was incarcerated at the medium-security facility in 2011; he spoke on the telephone with his girlfriend at least once every other week and with his mother at least once a week. David's incarceration in a medium-security facility did not prevent him from maintaining regular contact with his mother and girlfriend, demonstrating that his failure to respond to Alicia's message regarding Katie was not a result of his incarceration.[31]

The superior court did not err in finding that the Howards established by clear and convincing evidence that David's incarceration did not justify his failure to communicate meaningfully with Katie.

---

[31] David also relies on the Ninth Circuit's decision in *United States v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012), to argue that his inability to have meaningful contact with his daughter because of his incarceration was "of constitutional dimension," and that incarceration therefore provides "a blanket justification for failure to meaningfully communicate with a child." In *Wolf Child*, the Ninth Circuit held that a special condition of supervised release that prohibited a defendant from being in the company of minors, including his own children, was unconstitutional. *Id.* at 1087-88. *Wolf Child* recognizes no constitutional rights previously unrecognized by this court and in no way supports David's argument.

**b.** **The superior court did not clearly err in declining to find that the "agreement" between David and Alicia justified David's failure to communicate meaningfully with Katie.**

David argues that his failure to communicate meaningfully with Katie was justified by his agreement with Alicia. David asserts that Alicia's parents, on whom she was completely dependent, had threatened to "cut [Alicia] off financially" if David tried to maintain contact with his daughter, so he and Alicia agreed that he would not contact Katie. David also argues that because he could not be an active father while incarcerated, he and Alicia agreed that he would not contact Katie until he was released from prison and could participate actively in Katie's life. David asserts that this agreement justified his lack of communication.[32]

The following evidence supports the superior court's finding that, contrary to David's testimony, David and Alicia never made an agreement that David would not contact Katie: (1) David's forgery conviction undermined his credibility, which was critical because David's testimony provided the primary support for the existence of an agreement; (2) the letters undercut David's testimony that an agreement existed, or that he reasonably believed an agreement existed; and (3) the Howards testified credibly that they would not cut off their own daughter and that Alicia was not financially dependent on them, thereby undermining David's testimony that an agreement ever existed.

_____

[32] David argues his agreement with Alicia is similar to the agreement at issue in *D.L.J. v. W.D.R*, 635 P.2d 834 (Alaska 1981), where the father's lack of communication resulted in part from his efforts to comply with the mother's request that he not tell the child that he was the child's biological father. *Id.* at 839. *D.L.J.* does not support David's argument: the superior court in this case did not find that David and Alicia's agreement did not provide justifiable cause for his failure to meaningfully communicate; it found that "[t]he evidence clearly and convincingly establishes that *no agreement existed* between [David] and [Alicia] that [David] would have no contact with [Katie] until his release from incarceration." (Emphasis added.)

The superior court found that David's credibility was undermined by evidence of his past forgery conviction. Alaska Rule of Evidence 609 permits a party to attack a witness's credibility by admitting evidence that the witness has been convicted of a crime of dishonesty if less than five years has elapsed since the date of the conviction and the conviction is more probative than prejudicial.

On cross-examination the Howards' attorney questioned David about a 2007 forgery conviction. The superior court properly considered this conviction, which was less than five years old at the time of the hearing, after finding that its prejudicial effect did not outweigh its probative value. The superior court did not clearly err in finding that David's forgery conviction undermined his credibility.

Additionally, the letters David and Alicia exchanged between 2003 and 2005 in and of themselves clearly and convincingly establish that there was no agreement. David testified that he and Alicia formed their agreement by January 2004 at the very latest, but David sent a letter to Katie in April 2004 in which he stated, "I hope your mother reads this [letter] to you and all the ones to come." David acknowledged in the letter that he "ha[d] to get [his life] together" before things could work out between him and Alicia, and he also stated that he hoped he was able to get strong and well enough that Alicia would "give [him] a shot at the marriage [he] promised her." But David in no way indicated that he had to accomplish these things before he could contact Katie; to the contrary, David stated there would be more letters to come. David repeatedly inquired after Katie in his other letters to Alicia sent after the purported agreement had been finalized; they also do not indicate the existence of any sort of agreement. And David expressed frustration with Alicia in a 2004 letter after she failed

to communicate with him, stating, "I can't . . . believe you. . . . I would never loose [sic] contact with you and my daughter."[33]

The letters also undermine David's claim that he believed Alicia's parents would stop providing her with financial assistance if they knew Alicia or Katie was in contact with David. David sent three of his five letters to Alicia's parents' home. He sent the other two letters to the post office box solely because the first three had been returned to sender, and he indicated that he would send future letters to Alicia's parents' house if Alicia did not receive the letters addressed to the post office box. David's willingness to write to Alicia at her parents' home is inconsistent with his testimony that he feared the Howards would cut off Alicia if he had anything to do with her.

The Howards' testimony also undermines David's claim that he and Alicia feared that Alicia's parents would stop providing Alicia with financial assistance if David were to contact Katie. Jared testified he would never "cut [Alicia] off" or kick her out of his home or disown her, and Connie testified she had never "throw[n] out [her] daughter." Both parents also testified that although they paid for many of Katie's expenses, they provided Alicia with only limited financial support, and Alicia supported herself. The superior court found their testimony credible.

In sum, David's own evidence and testimony contradicts his allegation that an agreement with Alicia prevented him from meaningfully communicating with Katie,

---

[33] Additional extrinsic evidence also establishes that there was no agreement between David and Alicia. As the superior court noted, in her November 2003 motion to dissolve the protective order Alicia stated that she wanted to "work things out [with David] for me and the baby to be." This statement contradicts David's assertion that the no-contact agreement was being formulated at this time. David attributed this contradiction to Alicia's "[u]ps and downs, being pregnant, not knowing what to do, the father of her baby-to-be is in jail," but the dissolution motion is consistent with the letters in proving a lack of agreement between Alicia and David.

and the Howards' credible testimony further supports the superior court's finding that such an agreement never existed. The superior court did not clearly err in concluding that there was clear and convincing evidence that no agreement existed between David and Alicia that would justify David's failure to communicate meaningfully with his daughter.

> ### c. The superior court did not clearly err in declining to find that the Howards interfered with David's communication attempts.

David also argues that his failure to communicate with Katie was justified by the Howards' interference with his attempts at communication. David likens his situation to our decision in *S.M.K. v. R.G.G.*, where we held that a father and his family had interfered with the mother's attempts to communicate with the child such that the mother's failure to communicate was justified.[34]

In *S.M.K.*, the father interfered with the mother's communication attempts by leaving the family home with the child without advising the mother of his plans, giving custody of the child to his sister and her husband in another state, and refusing to tell the mother of the child's whereabouts.[35] The child's paternal grandmother also interfered with the mother's communication attempts by lying to the mother and to a sheriff, and by pulling a gun on the mother when she came to the grandmother's home to inquire after her child.[36]

*S.M.K.* is inapplicable here. David alleges no specific instances of interference by the Howards. David wrote one letter to Katie that was returned to sender,

---

[34]     702 P.2d 620, 623-25 (Alaska 1985).

[35]     *Id.* at 621-22.

[36]     *Id.* at 621.

but David does not allege that the Howards were responsible for this failed attempt at communication. David instead argues that he was precluded from communicating with Katie because, given her young age, any communication would require the Howards' assistance, and he could not enlist their assistance because he did not have much of a relationship with them. This lack of relationship does not amount to interference or justify David's failure to attempt to communicate with Katie.

David has produced no evidence of interference by the Howards in his attempts to communicate with Katie, and the superior court did not err in declining to find that the alleged interference justified his failure to communicate meaningfully.

> **d.** **The superior court did not clearly err in declining to find that the totality of the circumstances justified David's failure to communicate meaningfully with Katie.**

Finally, David argues that the totality of the circumstances justified his failure to communicate meaningfully with Katie. David relies on Katie's age, his own incarceration, his "agreement" with Alicia, Alicia's bipolar disorder, his "turbulent" relationship with Alicia, and his lack of a relationship with the Howards to argue that the totality of the circumstances provided justification. David cites to our decisions in *D.A. v. D.R.L.*,[37] *S.M.K. v. R.G.G.*,[38] *D.L.J. v. W.D.R.*,[39] and *In re Adoption of K.M.M.*,[40] as examples of cases where we have looked "at all the circumstances and [found] justification for a parent's failure to communicate with his child."

---

[37] 727 P.2d 768 (Alaska 1986).

[38] 702 P.2d 620 (Alaska 1985).

[39] 635 P.2d 834 (Alaska 1981).

[40] 611 P.2d 84 (Alaska 1980).

We have "relaxed the requirement of meaningful communication" in cases "where the child is too young to read or communicate over the telephone."[41] We have previously found justifiable cause in cases where a child is very young and where significant barriers to communication exist. In *D.A.*, for example, we affirmed the superior court's finding of justifiable cause where the child was too young to talk on the telephone or understand gifts or letters from the father, the mother postponed visitations requested by the father, the mother remarried and the father experienced emotional difficulty in visiting with the new family, and the new family was absent from Alaska for three months during the critical year period.[42] In *D.L.J.* we affirmed a justifiable cause finding where the biological father was separated from his child when the child was just three months old and lived far from the child, and the father was informed by the child's stepfather that his visits and money were unwelcome.[43] And in *S.M.K.*, discussed above, we affirmed a finding of justifiable cause where the biological mother lived a significant distance from her three-year-old child and her husband had actively prevented her from contacting the child for several years.[44]

Here, although Katie was too young to read or communicate over the telephone for the majority of David's incarceration, the totality of the circumstances did not justify David's failure to meaningfully communicate with his daughter. David made no real attempts to communicate with Katie after 2005. David implicitly asserts that such attempts would have been futile because his letters to Alicia and Katie were returned to sender and because he had problematic relationships with Katie's mother and

---

[41]     *D.A.*, 727 P.2d at 770 (citing *S.M.K.*, 702 P.2d at 624).

[42]     *Id.*

[43]     635 P.2d at 836-39.

[44]     702 P.2d at 621-25.

grandparents. But David alleges no instances of active interference of the type that existed in *D.L.J.*, *D.A.*, or *S.M.K.*[45] Even assuming that David's failure to communicate was initially justified by the fact that his letters were returned to sender, the circumstances still do not warrant a finding of justifiable cause because in 2009 Alicia made clear that she wanted to communicate with David about Katie, but David still failed to initiate contact with his daughter and waited over 18 months to communicate with Alicia.

The superior court did not clearly err in declining to find that the totality of the circumstances justified David's failure to meaningfully communicate with Katie.

## B. The Superior Court Did Not Abuse Its Discretion In Declining To Order Visitation.

David argues that the superior court abused its discretion by failing to consider his post-adoption visitation rights. David argues that this issue was clearly raised during the adoption hearing and asks us to remand for the superior court to consider whether he should be granted the right to visit with his daughter.

David has waived this claim because he failed to raise it in the superior court.[46] In none of his pleadings to the superior court did David ever argue he should be granted visitation rights. The only time visitation rights were ever addressed was at the

---

[45] *See D.A.*, 727 P.2d at 769 (mother repeatedly refused father's visitation requests); *S.M.K.*, 702 P.2d at 621-22 (father sent child to another state and refused to give custody to mother, and child's grandmother lied to sheriff and pulled gun on mother to prevent her from seeing child); *D.L.J.*, 635 P.2d at 836 (father was informed by stepfather that he and his money were unwelcome in child's life, and mother lied to child about the identity of her real father); *see also In re Adoption of K.M.M.*, 611 P.2d at 87-88 (it was "an emotionally traumatic episode" for father to visit children due to the fact that his wife left him and later married his best friend).

[46] *See Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001) ("A party may not raise an issue for the first time on appeal.").

consent hearing, when David's counsel asked the master, "[I]s this petition to . . . cut off his parental rights and have no visitation?" The master responded, "[Yes], it's the effect of an adoption. It would terminate all rights he has." Counsel responded that "adoptions can preserve visitation rights," and the master agreed, stating, "They can, if there's an agreement like that." David never indicated that he wanted to preserve his visitation rights or suggested that the court should consider whether visitation would be in Katie's best interests.

Although "Alaska's adoption statutes explicitly permit 'visitation between the adopted person and that person's [biological] parents and other relatives,' "[47] the statutes "do[] not give the [biological] parent a right to post-adoption visitation."[48] A court may in its discretion grant visitation rights if it finds that visitation is in the child's best interests, but the court is under no independent duty to do so.[49] Thus, David's rights were not violated by the superior court's failure to consider post-adoption visitation.

C. **The Superior Court Did Not Abuse Its Discretion By Awarding Attorney's Fees Against David.**

The superior court applied Alaska Civil Rule 82 to award the Howards $2,790.56 in attorney's fees, which was 22.5% of their actual fees. The superior court found that Rule 82 applied to this private contested adoption, that David was a party to the adoption, that Rule 82 does not exempt indigent litigants from paying attorney's fees and that David was not completely without assets, that the Howards' attorneys made

---

[47] *C.L. v. P.C.S.*, 17 P.3d 769, 778 (Alaska 2001) (quoting AS 25.23.130).

[48] *In re Adoption of A.F.M.*, 960 P.2d 602, 606 (Alaska 1998) (citing AS 25.23.130(c)).

[49] AS 25.23.130(c); *see In re Adoption of A.F.M.*, 960 P.2d at 606 (holding that AS 25.23.130(c) does not give the biological parent a right to post-adoption visitation).

-24- 6808

efforts to minimize fees, and that the Howards were entitled to a fee award. The superior court found that Rule 82(b)(2) called for a fee award of 30% of the Howards' reasonable, actual attorney's fees necessarily incurred, but that a downward variation was warranted in order to ensure that similarly situated parents of minimal financial means would not be deterred from voluntary use of the courts. The superior court thus reduced the Howards' $12,402.50 actual attorney's fees by 25% to $9,301.87, and awarded them 30% of $9,301.87, or $2,790.56.

David argues that the superior court abused its discretion by awarding any attorney's fees to the Howards. David notes that Rule 82(b)(3) allows a court to vary a fee award calculated under Rule 82 and argues that, because he is indigent, because his constitutional rights were implicated, and because his claims and defenses were reasonable, "[t]his court should find that all the equitable factors require this [c]ourt to find that no attorney fees should be awarded in this case should Co-Petitioners prevail."

Alaska courts generally award partial attorney's fees to the prevailing party in a civil case pursuant to Rule 82.[50] The purpose of Rule 82 is to partially compensate a prevailing party for the expenses incurred in winning a case.[51] Rule 82 gives the

---

[50] *See, e.g.*, *State v. Jacob*, 214 P.3d 353, 361 (Alaska 2009). Civil Rule 82(b)(2) provides:

> In cases in which the prevailing party recovers no money judgment, the court shall award the prevailing party in a case which goes to trial 30 percent of the prevailing party's reasonable actual attorney's fees which were necessarily incurred, and shall award the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees which were necessarily incurred.

[51] *Tobeluk v. Lind*, 589 P.2d 873, 876 (Alaska 1979) ("[The rule] is not intended as a vehicle for accomplishing anything other than providing compensation
(continued...)

superior court the discretion to vary a fee award upon the consideration of several factors, amongst which are the attorney's efforts to minimize fees; the reasonableness of the claims and defenses pursued by each side; the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts; and other equitable factors deemed relevant.[52]

Here, the superior court made a thorough, thoughtful analysis before awarding attorney's fees to the Howards. The superior court carefully considered our decision in *Adoption of V.M.C.*,[53] where we affirmed the award of attorney's fees against grandparents who unsuccessfully sought to adopt their grandchild without the biological father's consent, thereby rejecting the argument that attorney's fees should not be awarded in adoption proceedings as a matter of judicial policy and that such awards would create "a chilling effect upon the legitimate assertion of rights by both parties."[54] The superior court interpreted *Adoption of V.M.C.* as permitting fee awards against biological parents in contested adoption proceedings, but found that a variance was necessary to ensure that similarly situated parents would not be deterred from the voluntary use of the courts.[55] The superior court also gave thoughtful consideration to our decision in *Prentzel v. State, Department of Public Safety*, where we affirmed the

---

[51](...continued) where it is justified.").

[52]    Alaska R. Civ. P. 82(b)(3).

[53]    528 P.2d 788 (Alaska 1974).

[54]    *Id.* at 789-92, 795-96. ("[W]e do not find in the facts of this case or the equities of appellants' position any sufficiently demonstrable interest or justification" to warrant a departure from the usual procedure under Civil Rule 82.).

[55]    *See* Alaska R. Civ. P. 82(b)(3)(I).

award of attorney's fees against an indigent litigant.[56]  The superior court interpreted *Prentzel* as cautioning against but not prohibiting the imposition of fee awards against indigent litigants, and therefore appeared to find that any additional downward variation that might have been warranted by David's unconfirmed indigence[57] was cancelled out by the Howards' attorneys' efforts to minimize fees.

The superior court made a commendable effort to carefully consider our prior decisions addressing attorney's fees awards involving contested adoption proceedings and indigent litigants as well as the applicable variance factors listed in Civil Rule 82.  The superior court did not abuse its discretion in awarding a reduced fee award against David.[58]

---

[56]     In *Prentzel*, 169 P.3d 573 (Alaska 2007), the superior court found that the State was the prevailing party and awarded partial fees.  *Id.* at 594.  On appeal, the indigent litigant Prentzel argued that the award of attorney's fees should have been reversed because it could deter other similarly situated civil-rights litigants from bringing actions in good faith.  *Id.* at 595.  We disagreed, holding that "the superior court accounted for Prentzel's status as a pro se indigent litigant by cutting the [S]tate's hourly billing rate in half.  Moreover, the court ensured that time spent on Prentzel's civil rights claim and on his first appeal was not included in the award."  *Id.*  We thereupon affirmed the award of attorney's fees.  *Id.*

[57]     There was a question in the superior court about whether David was actually indigent.  The superior court found that he was indigent and appointed him counsel in the long-term guardianship hearing and in the adoption proceeding, but on cross-examination David indicated that he might at an unknown date be receiving an inheritance of an unspecified amount.

[58]     The only ground David advances for why we should overturn the fee award is that the superior court abused its discretion; he does not argue that attorney's fees should not be awarded against parents in contested adoption proceedings as a matter of law or policy.  Given the lack of briefing on this issue, the facts before us, and the superior court's fair and careful analysis, we decline to hold that the fee award in this case is invalid as a matter of law.  We note, however, that we are troubled by an award

(continued...)

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court in all respects.

---

[58](...continued)
of attorney's fees against a biological parent in what is effectively a parental rights termination proceeding. In the near-40 years since *Adoption of V.M.C.* was decided, we have recognized that "[t]he right to direct the upbringing of one's child is one of the most basic of all civil liberties" and is so important a right that "[d]ue process requires that [an] indigent [biological] parent be appointed an attorney to assist him in demonstrating why his consent to the adoption of his child should not be rendered unnecessary." *In re K.L.J.*, 813 P.2d 276, 279-86 (Alaska 1991) (internal quotation marks and citations omitted). Thus, although we do not reach the issue of whether attorney's fees awards should be barred as a matter of law against a biological parent in a contested adoption proceeding, we recognize there are strong policy arguments supporting such a ban. But again, given the superior court's careful, thoughtful analysis, we find no abuse of discretion in the case before us.